UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO. 24-1063 |
| Plaintiff, | ) | |
| | ) | COMPLAINT |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| NATIONAL GENERAL HOLDINGS | ) | |
| CORP.; NATIONAL GENERAL | ) | |
| INSURANCE COMPANY; NATIONAL | ) | |
| GENERAL LENDER SERVICES, INC.; | ) | |
| and NEWPORT MANAGEMENT | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**UNITED STATES' COMPLAINT AND JURY DEMAND**

## Table of Contents

INTRODUCTION ............................................................................................................. 4

PARTIES AND RELEVANT NON-PARTIES ......................................................... 7

FIRREA ........................................................................................................................... 8

FACTUAL ALLEGATIONS ........................................................................................ 10

I.      The CPI Program ............................................................................................... 10

II.     National General's CPI Services ...................................................................... 13

    A.  National General's Tracking Process ............................................................ 13

        1.  National General Tracked Insurance Using Hard Copy Documents and An Electronic Database. ................................................................................. 13

        2.  National General Tracked Insurance Through Its Letter Cycle Process. ...................... 14

    B.  National General's Placement Process .......................................................... 18

    C.  National General's Cancellation Process ...................................................... 20

    D.  National General and Wells Fargo Regularly Exchanged Information Regarding CPI Policies. ...................................................................................... 21

    E.  NGHC, NGIC, NGLS, and Newport All Participated in Running National General's CPI Program. ...................................................................................... 22

III.    National General's Scheme to Falsely Force-Place CPI ............................. 24

    A.  Significant Issues with National General's Tracking Systems Caused False Placements. 24

        1.  National General Failed to Notify Borrowers that CPI Would Be or Had Been Placed. 25

        2.  National General Failed to Obtain and Process Available Insurance Information. ....... 31

    B.  National General Knowingly and Recklessly Falsely Placed CPI. .................. 35

        1.  Cancelling CPI Over 90% of the Time Indicated That National General's Systems to Identify Outside Insurance Were Defective. ................................................... 35

        2.  National General Tracked and Reported its False Placements. ................................. 36

        3.  Wells Fargo Notified National General of False Placements Daily. ............................ 38

  4.    Thousands of Borrowers Complained about Force-Placed CPI to National General and State or Federal Agencies.............................................................................. 39

  C.  National General False-Placed CPI on Borrowers and Failed To Cancel and Refund the Premiums. ........................................................................................................ 42

  D.  National General Used the Mail and Wires in Furtherance of Its Scheme ....................... 44

IV.  National General's Scheme to Defraud Resulted in Harm to Borrowers and Affected Wells Fargo. .................................................................................................... 46

  A.  False Placements Cost Borrowers Thousands of Dollars in CPI Premiums and Other Related Fees. ................................................................................................... 46

  B.  False Placements Caused Borrowers to Default on Their Loans, which Resulted in Wells Fargo Repossessing Their Cars ................................................................................ 49

    1.    National General Falsely Placed CPI on Borrower 11's Account, Which Caused Her to Default on Her Loan, and Led to Wells Fargo Repossessing Her Car........................... 50

    2.    National General Falsely Placed CPI on Borrower 12's Account, Which Caused Him to Default on His Loan and Led to Wells Fargo Repossessing His Car. .......................... 52

  C.  False Placements Negatively Impacted Borrower's Credit Scores.................................... 53

  D.  Wells Fargo Was Affected by National General's Scheme to Defraud, and National General Obtained Money from Wells Fargo. .................................................... 54

COUNT I FIRREA CIVIL MONETARY PENALTIES PREDICATED ON MAIL FRAUD ... 55

COUNT II FIRREA CIVIL MONETARY PENALTIES PREDICATED ON MAIL FRAUD.. 58

COUNT III FIRREA CIVIL MONETARY PENALTIES PREDICATED ON WIRE FRAUD  60

COUNT IV FIRREA CIVIL MONETARY PENALTIES PREDICATED ON WIRE FRAUD  63

COUNT V FIRREA CIVIL MONETARY PENALTIES PREDICATED ON BANK FRAUD  66

COUNT VI FIRREA CIVIL MONETARY PENALTIES PREDICATED ON BANK FRAUD67

Plaintiff the United States of America brings this action against National General Holdings Corp. ("NGHC"); National General Insurance Company ("NGIC"); National General Lender Services, Inc. ("NGLS"); and Newport Management Corporation ("Newport") (collectively, "National General" or "Defendants") to recover penalties under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, and alleges as follows:

## INTRODUCTION

1.      Between October 1, 2005, and September 30, 2016, National General engaged in a scheme to defraud customers who financed their cars through Wells Fargo Bank, N.A, ("Wells Fargo") and a scheme to obtain money from Wells Fargo by "force placing" its Collateral Protection Insurance ("CPI") product on millions of cars, even though National General knew or recklessly disregarded the fact that borrowers already had insurance through other insurers. National General knew its deficient systems regularly resulted in a failure to adequately track borrowers' outside insurance, yet it continued force-placing insurance, knowing that it was force-placing insurance on borrowers that already had insurance. In fact, from 2008 to 2016, National General knew that it falsely force-placed insurance between 56 and 93% of the time. These improper force-placements harmed borrowers—causing borrowers to pay money they did not owe, borrowers to default on their loans, vehicle repossessions, and negative impacts to borrowers' credit scores. This action seeks to recover penalties under FIRREA in connection with these improperly force-placed CPI policies from April 24, 2008, through at least September 30, 2016 (the "Relevant Period").

2.      Consumers financing a vehicle through Wells Fargo borrowed, on average, about $15,000 for mostly used, older vehicles. The vehicles served as collateral for the loan. As a result, Wells Fargo required borrowers to obtain either comprehensive and collision insurance, or

CPI, to protect the vehicle.  CPI protected Wells Fargo's interests, but it did not protect the borrowers who paid for it.

3.      At least as of 2005, Wells Fargo contracted with National General, specifically National General's subsidiary Newport, to identify whether a borrower had the requisite car insurance.  Wells Fargo and National General referred to this process as loan "tracking."  If National General did not obtain proof of such insurance, National General automatically issued a certificate of insurance for its CPI product.  This was called "force-placing" insurance because the cost of the CPI was subsequently added to a borrower's loan, even though the customer did not affirmatively purchase the insurance from National General.

4.      The premiums that Wells Fargo borrowers paid for CPI force-placed by National General averaged nearly $1,100 per loan annually, or about $6,600 for a six-year auto loan. These premiums were generally more expensive than premiums for comprehensive and collision insurance that borrowers could buy on the open market, and CPI provided less protection for borrowers than comprehensive and collision insurance.

5.      For over a decade, National General systematically force-placed CPI on cars that were already insured and, therefore, did not need CPI ("false placements").  False placements occurred at an alarming rate—between 56 and 93% of the time.

6.      Sometimes National General realized its error before the borrower was billed, but, between 29 and 63% of the time, National General improperly invoiced Wells Fargo who then improperly billed the borrowers—forcing borrowers to pay premiums and other fees associated with the CPI that they did not owe.  Once the customer was billed for the CPI, Wells Fargo paid National General the amount of the premium, less any refunds.

7.     During the Relevant Period, National General falsely placed between 1.2 million and 2.1 million CPI policies.  About 600,000 to 700,000 of these false placements were cancelled before the borrower was charged for the premium, but about 640,000 to 1.4 million of these false placements resulted in the borrower being charged for the CPI premium.  During this time period, National General earned over $500 million in premiums and other associated fees in connection with CPI placements.

8.     National General knew or at least recklessly disregarded that it was falsely placing CPI and charging for duplicative insurance, but it took no meaningful steps to reduce the rate of false placements.  NGLS's Wells Fargo Account Manager dismissed false placements as a "function of the program."

9.     National General's scheme to falsely place CPI cost borrowers in a number of ways.  Borrowers paid not only premiums they did not owe, but also false interest charges and fees on their loans.  National General's scheme also harmed borrowers' credit scores when they were unable to pay what they did not owe, and increased the speed and frequency at which people lost their cars to repossession.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 12 U.S.C. § 1833a.

11.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1395, because National General has transacted business within the district, maintained employees and offices within the district, and/or a substantial part of the events and omissions giving rise to the United States' claims occurred in this district.

## PARTIES AND RELEVANT NON-PARTIES

12.     The Plaintiff is the United States of America, which brings this action in its own right pursuant to FIRREA, 12 U.S.C. § 1833a.

13.     Defendant NGHC is incorporated under the laws of Delaware and is the holding company for numerous subsidiaries.  It is licensed to operate in all 50 states, including Pennsylvania.  Effective January 4, 2021, NGHC became a direct wholly owned subsidiary of Allstate Insurance Holdings, LLC and an indirect wholly owned subsidiary of The Allstate Corporation (collectively, "Allstate").

14.     Before becoming a wholly owned subsidiary of Allstate, on October 1, 2015, NGHC closed on an agreement with QBE Investments North America, Inc. and its subsidiary QBE Holdings, Inc. (collectively, "QBE"), under which NGHC acquired the assets and liabilities of QBE's lender-placed insurance business.  Upon purchase, NGHC re-branded QBE as NGLS. Previously, on June 1, 2011, QBE acquired the lender-placed insurance business, including the assets and liabilities, of Balboa Insurance Company ("Balboa") and Meritplan Insurance Company ("Meritplan").  As such, NGLS is the successor in interest to QBE, Meritplan, and Balboa.

15.     Defendant NGLS is incorporated under the laws of Delaware.  It is a wholly owned subsidiary of NGHC.

16.     Defendant NGIC is incorporated under the laws of Missouri and is a subsidiary of NGHC.

17.     Defendant Newport is incorporated under the laws of California and is a wholly owned subsidiary of NGLS.  Prior to 2015, Newport was a wholly owned subsidiary of National General's predecessor-in-interest corporations, QBE and Balboa.  During the Relevant Period,

7

Defendant Newport force-placed CPI on borrowers throughout the Western District of Pennsylvania.

18.     During the Relevant Period, NGHC and/or certain of its divisions, subsidiaries, and predecessors-in-interest—including, but not limited to, NGLS, Newport, QBE, Balboa, and Meritplan—were responsible for tracking and placing CPI for Wells Fargo.  Over that period, Wells Fargo contracted with National General to track insurance and, if necessary, place National General's CPI.

19.     Wells Fargo is a national bank that is a federally insured financial institution with operations throughout the country that originates and services automobile loans.  During the Relevant Period, Wells Fargo and/or certain of its divisions, subsidiaries, and/or predecessors-in-interest, including, but not limited to, Wells Fargo Dealer Services, Inc. and Wachovia Dealer Services, Inc., contracted with National General to place CPI on Wells Fargo's auto borrowers.

**FIRREA**

20.     Congress enacted FIRREA in 1989 to help reform the federal banking system.  To that end, FIRREA authorizes the Attorney General to recover civil penalties for violations of enumerated criminal predicate offenses—as established by a preponderance of the evidence—that involve financial institutions or certain government agencies.  12 U.S.C. § 1833a(e).  Three enumerated predicate offenses that form the basis of liability under FIRREA are at issue in this complaint.

21.     First, 18 U.S.C. § 1341 prohibits a person from "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," and "for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or

deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed."

22.     Second, 18 U.S.C. § 1343 prohibits a person from "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," and who "transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

23.     Third, 18 U.S.C. § 1344(2) prohibits a person from "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice . . . (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."

24.     For violations occurring on or before November 2, 2015, FIRREA provides that the United States may recover civil penalties of up to $1.1 million per violation, or, for a continuing violation, up to $5.5 million, or $1.1 million per day, whichever is less.  12 U.S.C. § 1833a(b)(1)-(2); 28 C.F.R. § 85.3(a)(6), (7).  For violations occurring after November 2, 2015, FIRREA provides that the United States may recover civil penalties of up to $2.44 million per violation, or, for a continuing violation, up to $12.24 million, or $2.44 million per day, whichever is less.  12 U.S.C. § 1833a(b)(1)-(2); 28 C.F.R. § 85.5.

25.     The statute further provides that the penalty can exceed these caps in certain instances, allowing the United States to recover the amount of any gain to the person committing

the violation, or the amount of the loss to a person other than the violator stemming from the violation, up to the amount of the gain or loss.  12 U.S.C. § 1833a(b)(3).

## FACTUAL ALLEGATIONS

### I.     The CPI Program

26.     There are three primary types of auto insurance: liability, collision, and comprehensive.  Liability insurance provides coverage when the insured is at-fault for an accident that causes property damage or bodily injury.  Most states require car owners to have liability insurance.  Collision insurance provides coverage when an accident causes damage to the insured individual's car.  Comprehensive insurance provides coverage for non-collision damage to the car, like theft or fire damage.

27.     A fourth type of insurance, CPI, is "physical damage insurance," meaning it covers only the cost of damage to the insured car, not liability damage from events such as collisions.  CPI only protects the collateral for the loan—the car.

28.     Wells Fargo generally offered auto loans in two ways: directly via its Wells Fargo Auto Finance ("WFAF") division and indirectly through auto dealerships via its Wells Fargo Dealer Services ("WFDS") division.

29.     During the Relevant Period, the average Wells Fargo auto loan balance was $15,032.  Approximately 70% of the vehicles for which borrowers sought loans were four or more years old, while about 30% were seven or more years old.

30.     Both WFAF and WFDS loans required that borrowers obtain and maintain insurance on the purchased vehicle.  Borrowers satisfied this requirement by purchasing either comprehensive and collision insurance or a CPI policy.

10

31.     At least as of 2005, Wells Fargo contracted with National General to track whether borrowers had insurance and place CPI, if necessary.  National General was responsible for obtaining proof of the requisite insurance, identifying lapses in borrowers' coverage, notifying borrowers of its intent to place a CPI policy if National General identified a lapse in coverage, placing the CPI policy, and tracking communications between itself and the borrowers.

32.     National General was supposed to determine whether a borrower had the requisite insurance and, if not, place National General's CPI product.  Once placed, Wells Fargo, with limited exceptions, added the cost of the premium to the borrower's loan.  CPI was often referred to as "force-placed" insurance because a borrower did not choose to purchase National General's product.

33.     Some auto loans in Wells Fargo's portfolio were excluded from National General's force-placed CPI, such as borrowers with excellent credit, high dollar loans, or loans for the purchase of a Tesla.  In the Fall of 2014, for example, the WFDS exclusions included: loans known as "A0 Loans," loans originated in Ohio or in New Hampshire, loans in bankruptcy status, recreational finance loans, loans over $75,000, and Tesla loans.

34.     A0 Loans were the least risky loans to Wells Fargo. These borrowers typically had the best credit because the bank's A0 grade included requirements such as a minimum FICO score and the absence of derogatory credit information for twelve months.  And borrowers in New Hampshire and Ohio avoided force-placed CPI because those states prohibited CPI.

35.     During the Relevant Period, Wells Fargo sent, on average, nearly 2.4 million auto loans annually to National General to determine whether the borrower had insurance.  About 2.1 million of those loans did not fall into one of the exclusionary buckets and, thus, the vast

majority of Wells Fargo Loans required National General to track and confirm insurance coverage.

36.     National General earned an average annual premium of $1,124 per CPI policy during the Relevant Period.  Specifically, it charged its premium to Wells Fargo, and Wells Fargo, in turn, charged the borrowers.  National General knew that borrowers paid the premiums, which Wells Fargo ultimately remitted to National General.  National General earned at least $489.5 million in net written premiums from borrowers for force-placed CPI policies in connection with Wells Fargo loans during the Relevant Period.

37.     National General also earned a tracking fee for attempting to identify outside insurance on every active loan sent from Wells Fargo.  Initially, that fee was $0.10 per loan, but it was reduced to $0.05 per loan on March 1, 2013.  National General earned at least $22.1 million in tracking fees from Wells Fargo during the Relevant Period.

38.     Wells Fargo was National General's largest CPI client for auto lending; according to NGLS' President, Wells Fargo's CPI business generated 90-95% of National General's revenue for its CPI product.  He referred to CPI as the "bread and butter" of its lender-placed insurance.

39.     Wells Fargo formally notified National General on September 30, 2016, that it intended to stop force-placing CPI, effective immediately.  Wells Fargo was the last remaining large auto finance company using CPI, as many of its competitors had stopped using force-placed CPI as early as the mid-1990s.  Moreover, several of National General's other clients had already discontinued CPI, including HSBC in 2009 and Citibank in 2010.  Once Wells Fargo terminated its CPI program, National General was unable to attract other clients and terminated its auto CPI program altogether.

II.     **National General's CPI Services**

40.     Wells Fargo contracted with National General to manage the CPI program. National General was responsible for tracking whether a borrower had the requisite insurance and force-placing CPI if the borrower did not have insurance.  If National General obtained proof of insurance after force-placing CPI, it was required to cancel the CPI policy and refund the premium paid.

      **A.     National General's Tracking Process**

41.     Wells Fargo sent National General information about new loans electronically via a daily file.  Once National General loaded this information into its primary record-keeping system, known as the Collateral Command System ("CCS"), it began its tracking process to determine whether a borrower had insurance.  First, National General conducted limited searches for borrowers' insurance using information received via hard copy documents (mail, fax) and an electronic database.  Second, if those searches did not uncover borrower insurance information, National General began what it termed the "Letter Cycle," which was an approximately three-month period during which National General attempted to contact borrowers, insurance carriers, or agents to obtain proof of insurance.

           **1.     National General Tracked Insurance Using Hard Copy Documents and An Electronic Database.**

42.     National General received insurance information from Wells Fargo, borrowers, and/or insurance carriers via the mail, fax, or an electronic database.  When National General received hard copy insurance documents, it scanned the documents, creating an electronic image. National General's Data Entry Department then made limited attempts to match the imaged documents to the appropriate Wells Fargo loans in its system.

13

43.     If National General failed to match a scanned document to a loan, it moved the document to an "Unable to Locate" file and continued attempting to match the document to new loans it received from Wells Fargo.  If a document partially matched to a loan, National General would conduct an additional, manual review to confirm the match.

44.     National General also received insurance information electronically from insurance carriers through an "Electronic Data Interchange" or "EDI," which contained new insurance policies, cancellations, reinstatements, and supplemental insurance in a specified electronic format.  Matching through EDI was done electronically and was more accurate than manually matching imaged hard copy documents.  But only a subset of larger insurers participated in EDI.  As a result, National General received information through EDI only 41% of the time for Wells Fargo borrowers.

### 2.     National General Tracked Insurance Through Its Letter Cycle Process.

45.     National General's "Letter Cycle"—its affirmative efforts to seek out a borrower's insurance—was tied to the date it deemed a loan uninsured.  For new loans, National General deemed a loan uninsured if National General did not obtain what it considered to be sufficient evidence of insurance for the new loan through hard copy documents or EDI.  For existing loans, National General deemed a loan uninsured if National General received proof that an active insurance policy expired or had been canceled, or it did not receive affirmative proof that an outside policy was extended.

46.     The Letter Cycle consisted of mailing two letters to the borrower and attempting, at most, three calls to the insurance agent, insurance carrier, or borrower, depending on certain criteria.  National General sent the first letter, a template letter called the "Insurance Request Letter," about 42-46 days after the date National General deemed the loan uninsured.  In the

14

letter, National General notified borrowers that it had not received insurance information for the financed vehicle or that the known insurance coverage had expired, lapsed, or been canceled, and asked that the borrower provide proof of insurance.

47.     About 21 days after sending the Insurance Request Letter, National General customer service representatives ("CSRs") began attempting phone calls.  Until March 1, 2015, National General attempted between one and three calls to obtain borrowers' insurance information.  After that time, National General largely eliminated calls to borrowers, only calling borrowers when no insurance information had ever been received.

48.     During these calls, the CSRs followed scripts that set forth which questions to ask, how to respond to certain questions, and what to do when someone did not answer, among other things.  For example, following the script, CSRs told borrowers: "we currently show that we do not have current insurance coverage for the [car] that you have financed with us."  The CSRs also told borrowers, "If you do not have current insurance coverage through an agency or company of your choice, we may purchase insurance for you."

49.     National General initiated borrower communications primarily in its Mesa, Arizona office and its Moon Township, Pennsylvania office.  The Moon Township office housed a large call center, data entry division, and mailroom, and employees at the Moon Township office managed a significant portion of the borrower communications via phone and mail. Moreover, several high-level NGLS employees with responsibilities relating to the CPI program worked from the Moon Township office during most or all of the Relevant Period, including the Director of the Customer Care Department, the Wells Fargo Account Manager, and the Director of Insurance Tracking.  Later during the Relevant Period, National General opened two overseas offices that also handled some outbound calls.

50.     If National General did not receive what it deemed sufficient evidence of a borrower's coverage after sending the Insurance Request Letter and making calls, it sent a second template letter, the Coverage Issued Letter, about 77-81 days after the uninsured date. National General attached a Certificate of Insurance to the Coverage Issued Letter, which marked the "issuance" of the CPI policy.

51.     In the Coverage Issued Letter, National General informed borrowers that a one-year CPI policy was being purchased for them; an annual premium amount would be owed; and the CPI policy would be backdated to the uninsured date.  For example, the letter explained: "Our records indicate an absence of required insurance coverage since [DATE].  Since we have not received proof of the required coverage, we have exercised our contractual right to purchase insurance coverage at your expense to protect our interest in your financed vehicle . . . . the premium will be [AMOUNT]."

52.     The letter also stated that the entire annual premium plus interest (also referred to as a finance charge) would be due in monthly installments, unless the borrower notified National General that it was paying the annual CPI premium up front, or the borrower submitted proof of insurance.

53.     In connection with false placements, these letters and CSRs misled borrowers by stating they did not have the requisite insurance, had not provided the required proof of coverage, and owed a CPI premium.  For example, National General's Coverage Issued Letter misled borrowers by stating they needed CPI, often when they did not: "Our records indicate an absence of required insurance coverage since [DATE].  Since we have not received proof of the required coverage, we have exercised our contractual right to purchase insurance coverage."  The Coverage Issued Letter further misled borrowers by stating they owed a particular premium

when they did not: "[T]he premium will be [AMOUNT].  The premium will need to be paid."
And the company's CSRs, who were following National General's script for CSRs, misled
borrowers by stating National General did not have proof of the borrowers' insurance, even
though National General knew that its inadequate tracking systems often resulted in it failing to
collect borrowers' insurance information: "[W]e currently show that we do not have current
insurance coverage for the [car] that you have financed with us."

54.     At the expiration of a force-placed CPI policy, National General assumed the
borrower had not obtained insurance and relied on the borrower to affirmatively provide proof of
insurance to contradict that default position.  If National General did not receive sufficient proof
of outside insurance, the CPI policy renewed automatically.

55.     Although National General was responsible for handling the Letter Cycle, it hid
behind Wells Fargo during the entire tracking process, never notifying borrowers of its
involvement and, instead, holding itself out as Wells Fargo.  The letters never mentioned
National General; they were marked with Wells Fargo Dealer Services letterhead and signed by
"Wells Fargo Dealer Services."

56.     The letters also directed customers to provide proof of insurance to the "Insurance
Service Center," not National General.  If the borrowers followed the directions and called the
"Insurance Service Center," the CSR script was: "Thank you for calling the insurance service
center."  Similarly, the CSR script for outbound calls was as follows: "Hello! My name is ___
and I am calling from the Insurance Service Center for Wells Fargo."  CSRs did not reveal that
they worked for National General.  As a natural consequence, borrowers often believed that they
were communicating with Wells Fargo rather than National General.

**B.      National General's Placement Process**

57.      If National General did not obtain proof of insurance within 23-27 days of sending the Coverage Issued Letter to the borrower, it notified Wells Fargo that CPI should be placed by sending Wells Fargo an electronic file via interstate wire that listed the policies that National General determined required CPI.

58.      Wells Fargo then processed the file and, in most cases, paid National General for the CPI premium and charged the borrower by adding the CPI premium to the loan.  Because Wells Fargo was financing the premium, it also charged interest, which it called a "finance charge."  National General knew the premium and interest would be added to the borrower's loan and that Wells Fargo would remit the CPI premium to National General.  Thus, through the electronic files sent to Wells Fargo, National General sought to acquire money from Wells Fargo.

59.      Force-placing CPI was the default outcome for National General's systems.  For example, National General force-placed its insurance regardless of whether letters to the borrower had been returned to National General as undeliverable or whether National General had ever spoken to the borrower, the borrower's insurance agent, or their insurance carrier.  In some instances, National General force-placed its insurance even if a borrower's insurance agent had confirmed outside coverage but, for example, stated they did not have the documents on hand.  National General also force-placed its insurance even if it had received proof of insurance but the borrower or the borrower's insurance agent had failed to include the date the vehicle was added to the outside policy.  National General force-placed insurance in cases where a borrower had verbally confirmed they had outside coverage and provided the insurance agent's contact information but the agent was unavailable at the time National General called.

60.     Even though National General was force-placing annual CPI policies, it did not afford borrowers a year to pay the premium.  Rather, because National General backdated the force-placed policy by several months, it amortized the annual premium amount through the end of the policy.  Accordingly, borrowers typically paid for the entire annual policy, approximately $1,100 in total premium (plus interest), over about seven months.

61.     For example, **BORROWER 1** purchased a 2007 Mazda in 2012 or 2013. The borrower financed the loan through Wells Fargo.  At least two years after the purchase, on December 28, 2015, National General notified **BORROWER 1** by letter that it was force-placing CPI on her auto loan.  National General's letter stated that, since it could not locate insurance as of October 9, 2015, its CPI coverage was effective October 9, 2015, through October 9, 2016, and that it was "advanc[ing]" her the CPI premium of $745.  The letter further stated that unless **BORROWER 1** responded within ten days of the date of the letter, the $745 premium, plus interest of approximately $36.60, would be automatically added to her monthly payment in "7 equal monthly payments of approximately $97.70."  After **BORROWER 1** complained at least twice to National General that she had already provided proof of outside insurance—once on January 4, 2016, and again on February 19, 2016—National General canceled her force-placed CPI policy and issued her a full refund.

62.     A borrower's monthly payment increased on average 25% when National General's CPI premium plus interest was added to the loan.

C.      **National General's Cancellation Process**

63.      If, after issuing a CPI policy, National General determined the borrower had insurance during some or all the CPI coverage period, National General canceled the CPI policy.

64.      National General notified borrowers of cancellations in form letters, which, similar to the letters in the Letter Cycle, appeared to be from Wells Fargo.  For example, after National General twice received proof of insurance for **BORROWER 1**, National General sent **BORROWER 1** a Notice of Cancellation dated February 19, 2016, stating, "[i]f a premium was added to your contract/loan, it will be removed."  The letter did not address interest.

65.      National General grouped cancels into two categories:  flat cancels and partial cancels.  A flat cancel occurred when National General canceled a CPI policy in its entirety because the borrower had an outside insurance policy during the entire force-placed CPI coverage period.  A partial cancel occurred when National General canceled a portion of its CPI policy because the borrower had outside coverage for some, but not all, of its CPI policy period.

66.      National General further distinguished cancels based on whether they occurred before or after billing.  Pre-bill cancels were cancellations made after National General issued the CPI policy but before the borrower was billed for the premium.  Post-bill cancels occurred after the borrower was billed for the CPI premium.

67.      After a flat or partial cancel, National General refunded Wells Fargo the amount of premium paid by either wiring Wells Fargo the premium or deducting the amount owed from the net written premiums Wells Fargo owed National General in connection with new CPI policies.  Wells Fargo then directly refunded the premiums to the borrower.  No other monies, such as interest or late fees (i.e., fees assessed when the borrower was late on a payment), were refunded by National General.

20

68.     More often than not, National General issued refunds after a force placement. From 2010 to 2016, National General refunded borrowers between 75 and 95% of the time and issued over $1.5 billion in refunds.  The sheer volume of refunds served as a bright red flag that National General's systems were broken.  But National General ignored this indicator.  It continued force placing insurance at a high rate, even though it knew that many of the borrowers upon whom it was force placing CPI likely had insurance.

### D.     National General and Wells Fargo Regularly Exchanged Information Regarding CPI Policies.

69.     National General used various data systems to track and store information related to the borrowers in Wells Fargo's portfolio.  CCS was National General's primary system of record.  It housed information about the borrower (e.g., borrower name, contact information); borrower's loan; collateral (e.g., make, model, Vehicle Identification Number (VIN)); and CPI policies (e.g., effective date, issue date, expiration date, premium amount, cancel date).

70.     National General sent and made information available to Wells Fargo about the loans in its portfolio on a daily, weekly, and monthly basis via a separate system, ClientSource. ClientSource was an internet-based portal that was owned and managed by National General.

71.     ClientSource had two primary functions.  First, it served as a website that Wells Fargo employees could use to look up information about specific borrowers and their accounts. ClientSource gave Wells Fargo access to the information stored in National General's internal systems, such as CCS.  The main page of the website had a search function that allowed Wells Fargo's employees to search by account number and view information about the customer, collateral, loan status, and insured status.

72.     Second, ClientSource functioned as a data interchange platform.  Through ClientSource, National General sent and made available to Wells Fargo summary reports and

insurance documentation on a regular basis.  The various reports contained loan-level and summary information about the borrowers, collateral, and CPI policies.

73.     For example, National General uploaded a Delayed Billing Statement once per day that listed the loans where CPI had been placed or canceled.  National General also uploaded a Cancel Report and Tracking Activity Report once a month.  The Cancel Report summarized information regarding the number of flat cancels and provided loan-level detail related to those cancels, and the Tracking Activity Report provided the volume and percentage of letters sent during the Letter Cycle and CPI policies issued, billed, and flat canceled.

74.     Once National General uploaded documents and reports to ClientSource, Wells Fargo employees could access and download the same documents and reports.  NGLS and Wells Fargo employees accessed ClientSource from across the country.  For example, one of the Lead Product Managers at NGLS who was responsible for gathering data and creating reports related to the CPI program posted reports to ClientSource and was based in Irvine, California.  NGLS's Wells Fargo Executive Account Manager and Senior Operational Account Manager, both of whom were based in Pennsylvania, also accessed ClientSource to upload, review, and/or download account information.  As another example, one of Wells Fargo's Operations Managers regularly downloaded reports from ClientSource and was based in Winterville, North Carolina.

**E.     NGHC, NGIC, NGLS, and Newport All Participated in Running National General's CPI Program.**

75.     NGHC, NGIC, NGLS, and Newport each had roles in managing and conducting National General's CPI program and, often, those roles were indistinguishable.

76.     At least as of 2005, Wells Fargo contracted with National General's subsidiary Newport to track borrowers' car insurance.  After NGHC bought QBE and rebranded it as NGLS, NGLS was the primary entity tracking borrowers' insurance.

77.     Also after NGHC's purchase of QBE, NGHC told investors it would "leverage [its] existing infrastructure" to support NGLS's business.  As promised, NGHC was directly involved in the management of NGLS, with senior NGHC leadership receiving regular updates regarding NGLS's CPI business and, in turn, frequently providing their input on the direction of the business.  For instance, NGHC's senior leadership traveled to NGLS's Mesa, Arizona office for a presentation on the status of NGLS's business; advised NGLS's President and sales executives on existing and potential client relationships; and were involved in the discussions regarding how to move forward with its lender-placed insurance business after Wells Fargo ceased force-placing CPI coverage on its auto loan portfolio and how to respond to the press and the public when they inquired about NGLS's CPI practices.  Beyond that, NGHC executives, at times, signed documents on behalf of NGLS or directly responded to complaints about NGLS business practices.  And NGHC's Chief Executive Officer ("CEO") was the immediate supervisor of NGLS's President.

78.     Further, NGHC and NGLS executives involved in the oversight of National General's CPI program used NGIC email addresses (@ngic.com).  For instance, the then-President of NGLS used an NGIC email address.  NGHC executives—including Michael Karfunkel, the former CEO of NGHC; Barry Karfunkel, the former President and current CEO of NGHC; and the former Chief Financial Officer and Treasurer of NGHC—also used NGIC email addresses.  These executives, as well as other NGHC executives, used their NGIC email addresses when discussing and receiving updates on NGLS's CPI business.  Finally, internal organizational charts show NGIC's President reporting directly to NGHC's Chairman and CEO.

### III.    National General's Scheme to Falsely Force-Place CPI

79.    National General knowingly and recklessly false placed between 1.2 million and 2.1 million CPI policies during the Relevant Period.  Between 640,000 and 1.4 million of those false placements resulted in charges to borrowers.

80.    In connection with each false placement, National General made misleading statements that misrepresented to Wells Fargo and/or the borrower that the borrower needed CPI when he or she did not and that the borrower owed Wells Fargo money when he or she did not. National General made these material misrepresentations in the letters National General sent to borrowers; in the calls National General made to borrowers; in the communications and files National General sent to Wells Fargo regarding CPI; and in the borrowers' loan statements, which, once CPI was placed, reflected increased amounts to account for the cost of the CPI policy.

81.    Systemic issues with National General's tracking and placement processes, of which National General was aware, caused these false placements.  Rather than make any attempts to improve its operations, National General opted to continue falsely placing—and charging for—CPI for at least a decade.  Moreover, National General failed to cancel thousands of false placements, leaving borrowers without refunds they were rightly owed.

### A.    Significant Issues with National General's Tracking Systems Caused False Placements.

82.    National General's tracking system was broken.  National General failed to appropriately notify borrowers that CPI would be or had been placed, and failed to obtain and process outside insurance information, which resulted in hundreds of thousands, if not millions, of false placements from 2005 to 2016.

      **1.**     **National General Failed to Notify Borrowers that CPI Would Be or Had Been Placed.**

83.     In practice, the Letter Cycle failed to notify borrowers that CPI would be or had been placed.

     a.     First, National General's letters were regularly returned to it as undeliverable, without notifying or reaching the borrowers.

     b.     Second, in some instances, National General truncated the Letter Cycle, meaning it did not allow borrowers the full grace period to provide proof of insurance.

     c.     Third, National General's phone call system was ineffective.

     d.     And, finally, National General's burdensome and complex proof of insurance requirements, as described in more detail below, thwarted attempts by borrowers and agents, even when successfully reached, to stop CPI placement or cancel CPI.

     **i.**     **National General Force-Placed CPI Even When It Knew Borrowers Did Not Receive the Letters Notifying Them of Insurance Requirements or Requesting Policy Information.**

84.     The letters National General sent to borrowers were often returned as undelivered, but that did not stop the force-placement of CPI.  Despite knowing that a borrower had not been reached via its mailing system, National General force-placed CPI and charged a premium on those borrowers' accounts.

85.     During some periods, hundreds of pieces of mail per day were returned to National General as undelivered, amounting to thousands of letters per month.  For example, there were 7,451 pieces of undelivered mail returned to National General in September of 2016. Moreover, according to NGLS's former Director of the Customer Care Department, National

General heard "quite often" from customers who complained to National General that the letters had not been received.

86.     National General made note of the undeliverable mail in its systems but did not attempt to find the correct address information for the borrower and did not stop its Letter Cycle. Unless Wells Fargo affirmatively provided a new address, National General continued using the incorrect address, sending the letters and related materials to an address it knew was not current and where it knew the borrower was not receiving the information.

87.     Even if a borrower provided an alternative address directly to National General, or National General received proof of insurance with a new address, National General did not update its records and continued to send communications to the incorrect address. National General merely made a note in its system, sent the updated address information to Wells Fargo, and took no further steps to ensure the correct address was used moving forward.

88.     In an internal email, NGLS then-Vice President of Continuous Improvement explained the situation as follows:

> One thing that might stick out as I said is the handling of Undeliverable Mail. . . . When the loan is tracking for CPI and we are sending the document to the address on file and the Borrower sends in proof of insurance and their address has changed. When we reenter Letter Cycle we keep using the address associated with the loan and not the new address that was associated with the insurance.

89.     The letters sought insurance information from borrowers and notified borrowers when CPI was placed. When borrowers did not receive the letters, they were sometimes unaware that National General was seeking insurance information or that CPI had been placed, which resulted in false placements and other associated harms. According to NGLS's then-Head of Compliance and Operational Risk, and the now Senior Vice President of Wells Fargo, there was a "big correlation" between the "huge amount of return mails, and a lot of customers flat cancelling or telling us that they didn't know we put CPI."

90.     For example, National General recorded eight undeliverable mailings to **BORROWER 2** over an 18-month period, between July 2010 and December 2011.  National General force-placed at least three CPI policies on **BORROWER 2**, which began on January 24, 2010, February 26, 2011, and October 5, 2011, despite knowing that **BORROWER 2** had not received National General's letters.  National General ultimately partially canceled each of the three CPI policies.

91.     As another example, National General recorded ten undeliverable mailings to **BORROWER 3** over a 31-month period, between approximately June 27, 2011, and October 2015, to two addresses in Rhode Island.  The letters were sent from offices in Pennsylvania, California, and Utah.  Despite knowing that the borrower did not receive its letters, National General placed at least three CPI policies on **BORROWER 3** during that time, which began on September 30, 2013, May 13, 2014, and October 14, 2015.  National General ultimately partially canceled each of the three CPI policies.

### ii.     National General Force-Placed CPI Without Allowing Borrowers Adequate Time to Provide Their Insurance.

92.     Not all borrowers were afforded the usual grace period to provide National General with evidence of their insurance.

93.     In July 2016, just over a month before Wells Fargo stopped placing CPI on its loans, National General analyzed 70 loans with CPI cancellations.  It determined that it had truncated the Letter Cycle in 68 of those 70 loans, meaning that it had force-placed CPI in a shorter window than the grace period agreed upon by National General and Wells Fargo.  Indeed, in some instances, National General falsely placed CPI a mere 20 days after the loan was funded.

94.     Immediately after receiving these numbers, NGLS's Vice President of Continuous Improvement acknowledged in an internal email that truncating the Letter Cycle was a violation of National General's contract with Wells Fargo and drew a causal link between the truncated Letter Cycle and the high CPI refund rate.  Specifically, he contemplated that the high cancellation rate may be "because we aren't given [sic] the borrower enough time after they buy their car to have insurance converted over to the new automobile."

95.     National General determined that 40 loans in its 70-loan sample were post-bill flat cancellations, meaning that National General had placed and billed Wells Fargo for CPI that had to be fully refunded.

96.     After over a decade of false-placing CPI and about a month before Wells Fargo ended the CPI program, National General belatedly determined that it was not following its own Letter Cycle and that this failure contributed to false placements.  After making this determination, National General did not revisit prior instances of force-placed CPI to determine if additional refunds for borrowers were warranted.

### iii.     National General's Ineffective Phone Call Procedures Contributed to False Placements.

97.     At times, National General understaffed its Customer Care Department, resulting in a backlog of calls and a failure to make the requisite phone calls.  Failing to make these phone calls meant borrowers were not contacted about CPI.  National General then falsely placed CPI even though the borrower had valid existing insurance.

98.     National General also knew that calling borrowers, as compared to insurance carriers and agents, was ineffective.  Borrowers answered the calls less than 10% of the time. Despite knowing this, National General continued to use its inadequate call practices and continued to bill for premiums knowing that some borrowers likely had insurance.

99.     In the limited circumstances when National General reached a borrower, the borrower often told National General that they had already provided insurance information at the time they purchased the vehicle; that they could not, on the spot, produce the information that National General deemed necessary items for proof of insurance; or that they did not understand what was required.

100.    Overall, National General did little to educate borrowers and communicated limited information over the phone.  For example, the CSRs were only required to notify borrowers that National General "may purchase insurance" on their behalf.  The CSRs were not required to tell borrowers how expensive the National General CPI premiums were or explain how the premiums would be added and billed to their loan if they failed to respond with the required insurance information.

101.    National General never attempted to review the CSR scripts to ascertain whether changes would increase the borrower's response rates and result in a more productive conversation.  No substantive changes were ever made to the script to increase responsiveness.

102.    The most significant change to the phone call system during the Relevant Period was to eliminate calls, that is, to only call a borrower if no insurance had been received by National General.  This meant that National General eliminated even the few cases where insurance information was obtained via its three-call process.

103.    Due to the way this change was implemented in its systems, National General in fact eliminated all calls for certain borrowers.  In April 2015, National General learned that the requisite calls were not being made and that approximately 464 accounts were impacted, but it chose to do nothing.  By October 2015, National General still knew that it was not making the requisite calls, and over 11,000 accounts had been impacted at that point.  As its system was set

up to do, CPI automatically force-placed on every eligible loan for which it did not have the requisite proof of outside insurance—despite National General's failure to even attempt to obtain outside insurance via phone calls.  National General knew that it was force-placing CPI on vehicles that were likely insured.

   **iv.**  **National General Established Burdensome and Complex Requirements for Borrowers to Escape Its Force-Placed CPI.**

  104. National General's system was set up to force-place CPI—and bill for premiums—on every eligible Wells Fargo loan unless it matched what it deemed "sufficient" proof of outside insurance with a loan.

  105. National General required more than eight data points to verify outside coverage over the phone, most of which were not readily available from, for example, an insurance card. Rather, borrowers generally were required to read their insurance information from their policy's declaration page.

  106. These data points included: the year, make, and model of the vehicle; the last 5 digits of the VIN; the policy number; the effective date of the policy; the policy expiration date; and the comprehensive and collision deductible.  If any of these pieces of information were missing, National General deemed the proof insufficient, making it difficult for a borrower or agent to stop National General from force-placing CPI.

  107. National General made no changes to these requirements—nor did it bother to examine them—notwithstanding that it knew that it was falsely placing its CPI product most of the time.

  108. Moreover, as compared to the automatic force-placement of CPI, National General set up stringent rules to cancel CPI.  For example, National General would not accept a borrower's verbal verification that she or he had outside insurance once it force-placed CPI, even

if the borrower had all the necessary data; it required that a borrower have an agent call National General or submit the policy's declaration page. National General would not even accept verification via an insurance carrier website if that website did not include the minimum eight data points, including the date the vehicle was added. So, for example, even if a borrower called National General and provided every element of data on the outside insurance policy and National General could verify 7 of the 8 data points on the carrier's website, National General would not cancel its force-placed policy.

109.    Also, National General only permitted select personnel with additional training to cancel its CPI. By contrast, the placement and billing of CPI required little manual action, much less by specific people.

### 2.    National General Failed to Obtain and Process Available Insurance Information.

110.    National General also failed to obtain and process available insurance information during the CPI tracking process. Specifically, National General did not obtain the insurance information borrowers provided at the time the borrowers purchased the car, did not adequately utilize readily accessible databases to search for available proof of insurance, and did not accurately match proof of insurance, if obtained, to borrowers' loans.

### i.    National General Did Not Obtain the Insurance Information Borrowers Provided When They Purchased Their Cars.

111.    Wells Fargo auto loans required borrowers to provide proof of insurance within a short time after purchasing the car. Many state driving laws also required borrowers to provide proof of liability insurance before driving the car off the lot. But National General did not obtain this insurance information from Wells Fargo before it began the tracking process.

112.    For years, National General knew that this failure was one of—if not the single

greatest—factor causing false placements.  NGLS's President even explained that if it had

obtained this insurance information, flat cancels would have decreased.  National General also

knew that this failure caused borrower confusion during the Letter Cycle process.  Specifically,

borrowers were unaware that the insurance information they provided when they purchased their

car was not collected by National General and believed that they had complied with their

insurance obligations under the loan agreement.  National General was aware of this confusion.

113.    For example, **BORROWER 4** purchased a 2015 Volkswagen Jetta with financing

from Wells Fargo.  National General advised the borrower via letter dated September 3, 2015,

that it had not received the borrower's insurance information for the period beginning July 23,

2015.  **BORROWER 4** in fact had outside insurance covering this period.  **BORROWER 4's**

insurance carrier utilized EDI, so National General would have had proof of **BORROWER 4's**

insurance available to it via its EDI systems.  Nevertheless, National General force-placed its

CPI on October 9, 2015, via letter, stating it had "not received proof of the required coverage."

The letter also stated that **BORROWER 4** owed a $1,296 premium, which was a false statement

given that the borrower had insurance and proof of such insurance was available to National

General through EDI.  **BORROWER 4** called National General at least once, on February 5,

2016, to complain about the placement of CPI.  National General's notes from that call indicate

that the borrower told National General that he was upset that CPI was placed when he had

already provided evidence of insurance: "Borrower provided insurance information to the

dealership, they should've forwarded it."  CPI was thereafter flat canceled.

114.    National General did not seriously engage with Wells Fargo to ascertain whether

it could obtain, electronically or otherwise, the insurance information collected by dealerships.

National General did not demand that Wells Fargo provide the information.  National General was too concerned that Wells Fargo would "pick up [its] business and move somewhere else" if it made demands of Wells Fargo, according to NGLS's then-President.  In other words, National General's priority was maintaining its lucrative contract with Wells Fargo.

### ii. National General Often Failed to Match Proof of Insurance to a Borrower's Loan.

115.    Even when National General obtained proof of insurance, it often failed to match it to the borrower's account.  National General typically received insurance documentation through mail, fax, or EDI.  EDI produced a higher loan matching rate, required less manual input from its employees, reduced exceptions and risk, and allowed for faster processing.

116.    National General knew that EDI was an effective loan-matching tool, so it presented inflated statistics on its EDI capabilities to Wells Fargo.  National General advertised to Wells Fargo that it received over 80% of all auto transactions through EDI.  But this figure was misleading.  The 80% represented the percentage of documents received via EDI compared to all documents received (e.g., via mail, fax, or EDI).  In fact, National General received information through EDI only 41% of the time for its auto portfolio.  National General was aware this was false and misleading because it knew it was manually matching documents to loans for most borrowers, yet it presented misleading statistics to Wells Fargo in an attempt to falsely demonstrate the effectiveness of its loan matching.

117.    Moreover, National General's internal policy was to match insurance information to a loan using the borrower's name, account number, policy number, and VIN.  But, in practice, National General sometimes used only the VIN to match insurance information to a borrower's account.  Because of this, National General often failed to match the insurance information to the loan or matched insurance information to the wrong loan.

118.    For example, in July 2016—just six weeks before Wells Fargo terminated CPI placement—National General conducted an internal analysis of how often it failed to appropriately match insurance documentation.  National General reviewed a sample of 70 loans and determined that it improperly matched expired or cancelled insurance policies based on the VIN to 51 of those loans that actually "belonged to the prior owner of the car, not the person who had the loan with WFDS."

119.    Accordingly, even though the name, address, and sometimes state, on the cancelled or expired insurance policies did not match the loan, National General considered it a match.  This caused the process of force-placement to begin, because National General considered the policy to be expired or cancelled.  For 40 of the 51 loans, the improper match "led to CPI tracking, Placement, Flat Cancellation and Refund."  For 11 of the 51 loans, the improper match "led to CPI Tracking/Letter Cycle to start for the wrong reason."

120.    National General acknowledged that this matching issue occurred, in part, because one of its policies for matching advised to match EDI "based on VIN alone," which was "highly problematic."  National General admitted that its "human error was really, really concerning."

121.    National General did nothing for over a decade to improve its processes.  It was not until the end of 2016—less than a month before Wells Fargo terminated CPI placement and only after Wells Fargo expressed concern that flat cancels were too high—that National General considered revising the Letter Cycle to make it more efficient and decrease borrower complaints.

122.    For example, knowing that it was falsely placing CPI at high rates, National General considered using readily available third-party websites to locate borrowers, obtain insurance information, and confirm cars' VINs.  National General also considered reorganizing

the Letter Cycle, including adding various protocols to follow up with borrowers who provided

verbal confirmation of insurance, and beginning the Letter Cycle with a call to carriers before

issuing letters.  National General only considered these simple, and potentially effective, changes

when its CPI business was on the line.  And, ultimately, it implemented none of the changes.

**B.     National General Knowingly and Recklessly Falsely Placed CPI.**

123.    National General knew from the sheer volume of policies it canceled and

premiums it had to refund that it was falsely placing CPI.  National General tracked false

placements and reported them to Wells Fargo.  Separately, Wells Fargo received insurance

information directly from borrowers that had false-placed CPI and, in turn, provided that

information to National General on a daily basis. In addition, customers called National General

to complain about false placements, putting National General on notice that it was falsely placing

insurance.

**1.     Cancelling CPI Over 90% of the Time Indicated That National
        General's Systems to Identify Outside Insurance Were Defective.**

124.    During the Relevant Period, National General issued over 2.1 million cancels—

approximately 1.25 million flat cancels and 850,000 partial cancels.  This equaled over 90% of

National General's CPI portfolio.

125.    Approximately 1.4 million of those cancels occurred after Wells Fargo had

already charged borrowers for the CPI premium, that is, after the CPI premium was added to the

customer's loan.  About 640,000 of those were flat cancels ("Post-Bill Flat Cancels"), and

760,000 were partial cancels ("Post-Bill Partial Cancels").

126.    National General also tracked refunds associated with cancels, including the

amount refunded to each borrower and the rate of refunds as compared to its total portfolio.

Between 2010 and 2016, National General refunded approximately $500 million dollars in

connection with partial cancels.  On average, the associated borrowers received refunds of about $1,000 each.  During the same time period, National General refunded approximately $1 billion dollars in connection with flat cancels.  On average, the associated borrowers received refunds of about $1,500 each.

127.    Overall, National General refunded some amount of premium, whether in connection with a flat cancel or partial cancel, approximately 75-95% of the time between 2010 and 2016.  The fact that its business model was to bill borrowers first and then scramble to give borrowers back their money for the vast majority of the policies that it force-placed was a red flag that National General ignored year after year.

### 2.    National General Tracked and Reported its False Placements.

128.    National General tracked false placement numbers and maintained data regarding false placements in its various, readily accessible systems.  National General used the data in its systems to generate reports regarding false placement rates and trends, and these reports were circulated internally and sent to Wells Fargo on an annual, bi-annual, quarterly, monthly, and sometimes ad hoc basis.

129.    For example, National General held quarterly business reviews with Wells Fargo to present on CPI.  National General's presentation was generally the same format between 2009 and 2017 and included a slide with information on false placement rates and trends.  The slide contained a graph showing the cancel trends over time and the five-year cancel averages.  An example is below.



In small text below this graph, National General states, "Cancel % are after billing."  Indeed, the cancel averages presented at these reviews were usually post-billing cancels.  Had National General included pre-bill cancellations, the rates would have been significantly higher.  National General circulated these presentations internally and to Wells Fargo via interstate email.  For example, in May 2014, the presentation was sent from a National General employee located in California to Wells Fargo and other National General recipients located in Moon Township, Pennsylvania and North Carolina.  In June 2015, the presentation was sent from a National General employee in Pennsylvania to a Wells Fargo employee in North Carolina.  And, in July 2016, a National General employee located in Pennsylvania sent the presentation to Wells Fargo and National General employees in California and North Carolina.

130.    National General also prepared internal monthly data reports referred to as the "monthly datamart file."  These monthly files were not shared with Wells Fargo and included

more information than what was provided to Wells Fargo in the quarterly business reviews.

Among other things, these reports included the total number of cancels over time; the number

and percentage of cancels compared to National General's other CPI clients; and the amount

refunded in connection with cancels.  These reports were circulated internally to National

General leadership via interstate email and contained data dating back to at least 2009.  For

example, in February 2016, December 2015, and October 2014, a National General employee in

California sent the monthly file to a National General employee in Pennsylvania.

### 3. Wells Fargo Notified National General of False Placements Daily.

131.    On a daily basis during the Relevant Period, Wells Fargo sent information to

National General regarding loans on which Wells Fargo determined National General had falsely

placed CPI because the borrower had outside insurance.

132.    Specifically, Wells Fargo sent National General a spreadsheet of loans, which

they referred to as the "Special Activities Report" or "SAR."  The report listed loans that

currently had force-placed National General CPI but where the borrower provided outside

insurance information directly to Wells Fargo, usually through its collections department or a

branch office.  The SAR daily list typically included 150-200 loans that had force-placed CPI,

meaning the loans had supposedly been through National General's tracking process.  Wells

Fargo sent these reports to National General via interstate email.  For example, in August and

September 2015, a Wells Fargo employee located in North Carolina sent a SAR report to

National General employees in Arizona and/or Pennsylvania.

133.    Via these reports, Wells Fargo tasked National General with verifying the

borrowers' outside insurance.  And National General determined that, on average, 88% of the

listed borrowers in fact had outside coverage, proof of which National General failed to obtain

during its own tracking process.  Every single day, National General force-placed insurance on borrowers knowing that a significant number of those borrowers likely had insurance and would be entitled to a refund.

### 4.  Thousands of Borrowers Complained about Force-Placed CPI to National General and State or Federal Agencies.

134.    Thousands of borrowers called National General to complain about CPI placement, some of them repeatedly.  For example, borrowers complained that they were receiving letters about CPI when they did not need CPI; that they had not been notified prior to CPI placement; or that they had already provided evidence of insurance.

135.    National General did not systematically track complaints until 2014, when new federal guidelines required it do so.  Moreover, National General did not use the complaints to improve any of its defective systems; rather, National General's purpose in tracking complaints was to "document only," according to National General's Customer Care Manager.

136.    National General logged over 41,000 complaints, nearly all phone calls, related to its force-placed CPI in 2015 alone.  It categorized the complaints into groups, including:

| | |
|---|---|
| Document Not Received | Evidence of insurance was previously sent |
| Document Not Reviewed | Documents updated incorrectly |
| Document Not Updated | Paper/EDI documents not updated. Must verify document was received before making this selection. |
| Duplicate Coverage | LP is in force but borrower has preferred coverage |

137.    Over 25,000 of the complaints were borrowers telling National General they already had outside insurance; that is, they fell into one of the above four categories.  Most of the complaints—over 21,000—were labeled by National General as "Document Not Received."  In other words, over half of the complaints in 2015 were from borrowers saying they had previously provided insurance information to National General, but National General failed to capture or maintain that information in its tracking system.

138.    For example, on June 26, 2015, **BORROWER 5** complained to National General. In its notes regarding the complaint, National General provides, "Borrower upset that document being sent are not being received and updated to his account.  He is being charged for lender insurance now."  National General had force-placed two CPI policies on **BORROWER 5's** account, on October 12, 2014 (effective July 27, 2014), and May 14, 2015 (effective February 26, 2015), charging about $2,500 for its CPI policy premiums.  Both of **BORROWER 5's** CPI policies were ultimately flat canceled.

139.    On August 24, 2015, National General received a complaint from **BORROWER 6**: "Borrower is upset we placed collateral protection when insurance was already provided. Borrower is upset we keep calling trying to verify Insurance coverage.  Verified insurance thru website and was able to verify insurance coverage and updated account."  National General had placed CPI on **BORROWER 6's** account on February 16, 2015 (effective December 1, 2014), charging $1,424 in CPI premium.  **BORROWER 6's** CPI policy was ultimately flat canceled.

140.    Borrowers also submitted complaints regarding CPI to other entities, including the Office of the Comptroller of the Currency ("OCC"), the Consumer Financial Protection Bureau ("CFPB"), state departments of insurance, state better business bureaus, and state Attorneys General offices.  National General sometimes called these "escalated complaints."

141.    When Wells Fargo received notice of an escalated complaint, it typically contacted National General to seek National General's feedback on the merits of the complaint and request documentation, including copies of the letters National General sent to the borrower, a chronology of the transactions related to the placement of CPI on the borrower's account, and/or copies of the insurance information National General received from the borrower.

National General knew about these complaints and the issues related to false placements that borrowers were raising with regulatory agencies across the country.

142.    For example, in February 2013, **BORROWER 7** financed an auto loan through Wells Fargo for a Ford Ranger.  **BORROWER 7** obtained an outside insurance policy effective February 26, 2013, covering the Ranger.  **BORROWER 7** provided proof of insurance at the time of purchase.  National General nevertheless placed CPI on **BORROWER 7's** account effective February 26, 2013, and charged her a $652 premium.

143.    On May 23, 2013, **BORROWER 7** again submitted proof of her insurance.  In the customer comments section of her submission, she noted: "this [proof] has been faxed and mailed two separate times.  Why is this still an issue?"  Indeed, she provided proof to National General that she had an active policy in place effective February 26, 2013.  National General did not cancel its CPI policy.  Five days later, on May 28, **BORROWER 7** again provided proof of insurance to National General, demonstrating CPI was unnecessary.  On July 16, National General again received proof of **BORROWER 7's** insurance, including the declaration page.  National General called **BORROWER 7's** insurance agent and confirmed policy coverage and the date the vehicle was added.  Notes in National General's system showed outside insurance coverage for the entire period it had force-placed its CPI product.  But National General still did not cancel **BORROWER 7's** CPI policy.

144.    After providing her insurance information to National General at least three times over as many months, **BORROWER 7** submitted a complaint to the OCC on September 25, 2013, explaining how National General had false-placed CPI on her account and failed to cancel that CPI.  Just two days later, on September 27, National General canceled its CPI policy.

**C.     National General False-Placed CPI on Borrowers and Failed To Cancel and Refund the Premiums.**

145.    After ending its CPI placement program, the OCC required Wells Fargo to remediate CPI customers for force-placed policies, as set forth in a Consent Order executed in 2018.  As of March 2020, Wells Fargo identified approximately 1,060,000 CPI policies across 943,500 accounts placed between approximately 2005 and 2016 that were eligible for remediation and paid an estimated $520.4 million to impacted customers.  NGLS's Customer Care Director testified that she was not surprised that Wells Fargo was able to identify false placements during its post hoc remediation.

146.    Wells Fargo remediated customers for a variety of costs and harms incurred due to force-placed CPI policies, including: (1) CPI interest; (2) improperly assessed fees, like late fees; (3) CPI premiums, less any refunds received in the ordinary course of CPI policy cancellation; (4) loan interest; and (5) costs associated with vehicles that were repossessed due to CPI.

147.    Customers eligible for remediation included, among others, borrowers who had their force-placed CPI policies only partially canceled and refunded before Wells Fargo terminated its relationship with National General, when the policy should have been fully canceled and refunded.

148.    Eligible customers also included borrowers whose force-placed CPI policies were never canceled, meaning the borrower never received any refund for the premiums he or she paid ("Non-Cancel Borrowers").  Wells Fargo identified over 14,000 policies that National General should have canceled but did not.  Wells Fargo paid remediation to these customers of approximately $16.1 million.  This means most of these borrowers had to wait years to receive refunds through the remediation process.  Many of the borrowers identified by Wells Fargo

during its remediation as having force-placed insurance that required a refund had, in fact, notified National General during the CPI program that they had outside insurance, but National General ignored their complaints.

149.    For example, National General placed two CPI policies on **BORROWER 8's** account, issued September 10, 2015, and June 27, 2016, charging $1,549 in premiums for both policies.  **BORROWER 8** called National General on July 5, 2016, complaining that the CPI policies were falsely placed; National General's records show: "she was upset because she said that she already faxed proof of insurance and now she has cpi on her account because we dindjt received anything [sic]."  National General did not cancel the CPI policies.  Wells Fargo verified during its remediation process that **BORROWER 8** had outside insurance while the force-placed policies were in effect and issued her a refund.

150.    National General placed two CPI policies on **BORROWER 9's** account, issued August 30, 2015, and June 13, 2016, charging $1,806 in premiums for both policies. **BORROWER 9** complained to National General on May 5, 2017, that the CPI policies were falsely placed; National General's records show: "spoke with borrower unhappy has been getting charge cpi coverage said has had full coverage at all this time insurance company has called with information."  National General did not cancel the CPI policies.  Wells Fargo verified during its remediation process that **BORROWER 9** had outside insurance while the force-placed policies were in effect and issued **BORROWER 9** a refund.

151.    National General placed a CPI policy on **BORROWER 10's** account, effective February 23, 2016, through February 23, 2017, charging $1,254 for the premium. **BORROWER 10** called National General on March 21, 2017, to complain about false placement; National General's records show: "He faxed the dec page of ins and wants to know

why he's still getting calls."  Wells Fargo verified during its remediation process that **BORROWER 10** had outside insurance while the force-placed policy was in effect and, as a result, issued him a refund.

### D.    National General Used the Mail and Wires in Furtherance of Its Scheme

152.    Mail and interstate wires were integral to National General's scheme to falsely force-place CPI on borrowers.

153.    National General used the mail during the Letter Cycle to send borrowers the Insurance Request Letter, the Coverage Issued Letter, and a Certificate of Insurance, and it caused Wells Fargo to falsely bill borrowers via the mail for CPI premiums.

154.    National General's contracts with Wells Fargo required that it send at least one letter to borrowers who had failed to provide acceptable evidence of the requisite insurance.  In the letters, National General made representations regarding the borrowers' alleged insured status, the required proof of coverage, the purported CPI premium owed, and when (or whether) CPI was or would be placed.

155.    Upon information and belief, National General mailed at least one letter to each borrower upon whom it placed CPI during the Relevant Period.  In connection with nearly all false placements, the letters contained misleading statements that misrepresented that the borrowers needed CPI when they did not and that the borrowers owed Wells Fargo money when they did not.

156.    After National General force-placed CPI, Wells Fargo added the cost of the CPI premium to the borrowers' loans, which was subsequently reflected in the borrowers' monthly billing statements.  Before 2016, these billing statements did not itemize the amount added for CPI premium or related fees.  The statements simply showed an increased total amount owed per

month, without any additional explanation.  It was not until the latter part of 2016, around the time the CPI program ended, that the monthly billing statements were changed to itemize the CPI premium and related fees.  In connection with each false placement, these bills, sent by Wells Fargo as a result of National General's misstatements to Wells Fargo, misrepresented to the borrowers that they owed money for CPI premiums.  Upon information and belief, Wells Fargo mailed these bills to each borrower who participated in paper billing during the Relevant Period.

157.    National General also used interstate wires, including the internet, email, and phone calls, in furtherance of its scheme to falsely force-place CPI.  Specifically, National General utilized an internet-based website called ClientSource to send Wells Fargo information related to the loans in Wells Fargo's portfolio.  Wells Fargo used the information National General uploaded to ClientSource to identify which borrowers should be billed for CPI and which borrowers should be refunded for premiums paid in connection with false placements.  Wells Fargo also used this information to calculate how much it owed National General for the CPI policies placed.  Upon information and belief, each false placement was preceded by an interstate wire transmission from National General informing Wells Fargo that CPI should be issued.

158.    National General and Wells Fargo also regularly communicated via interstate email regarding CPI policies and, often, falsely placed CPI policies.  National General sent Wells Fargo the Business Reviews via email; National General and Wells Fargo exchanged emails regarding the disposition of customer complaints; and Wells Fargo sent National General the SARs via email.

159.    Finally, National General also exchanged calls with borrowers, insurance agents, and insurance carriers regarding the borrowers' insurance coverage across the country.  For

example, National General's calls originated from Arizona and Pennsylvania and, later, overseas and **BORROWERS 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12** lived in states other than Arizona and Pennsylvania during the time of their interactions with National General.  As such, National General's calls to those borrowers were interstate wires.  Borrowers also called National General to complain about false-placed CPI and the harm it caused them.  For example, **BORROWERS 5 and 6** called National General to complain about National General force-placing insurance after **BORROWERS 5 and 6** had provided proof of insurance.  Upon information and belief, National General made or received calls in connection with most false placements.

**IV.    National General's Scheme to Defraud Resulted in Harm to Borrowers and Affected Wells Fargo.**

160.    Despite knowing about the problems with its CPI program and the harm caused by false placements, National General continued false placing its CPI product on borrowers' automobiles with minimal, if any, changes to its broken program.  Among other harms, false placements forced borrowers to pay money they did not owe; caused borrowers to default on their loans, which sometimes led to the repossession of their cars; and negatively impacted borrowers' credit scores.  Moreover, false placements also affected Wells Fargo because, among other reasons, with each false placement, National General fraudulently obtained money from Wells Fargo in the amount of the CPI premium.  And in connection with flat or partial cancels, Wells Fargo had to refund the borrowers for premiums the borrowers paid but did not actually owe.

**A.    False Placements Cost Borrowers Thousands of Dollars in CPI Premiums and Other Related Fees.**

161.    False placements cost borrowers thousands of dollars in CPI premiums, associated interest charges, and other fees, like late fees.

162.    **Premiums.**  National General tracked, maintained, and circulated data regarding gross written premium and net written premium (i.e., the gross written premium less any CPI premium refunded).  During the Relevant Period, National General earned $489.5 million in net written premiums from borrowers for force-placed Wells Fargo CPI policies.

163.    In addition to the millions in premiums National General retained, it refunded over $1.5 billion dollars in CPI premiums during the Relevant Period that borrowers had paid for false placements.  These refunds, however, were not always issued immediately.  Some borrowers had to wait months or even years to receive refunds from National General in the ordinary course of business.

164.    In 2017, National General reviewed a sample of 100 loans where CPI had been canceled because the borrower had outside insurance at the time CPI was placed.  Out of the 100 loans, National General identified 23 where it failed to cancel CPI upon receipt of the borrowers' proof of insurance.  For 13 of the 23 loans, National General took between 177-1434 days to cancel duplicative CPI.  National General reasoned that its "inconsistent" and "difficult to follow" policies and procedures likely contributed to these "document processing errors."

165.    NGLS's Vice President of Continuous Improvement acknowledged that the internal reports and scorecards regarding refund timeliness "look[ed] bad."

166.    To account for these delays, Wells Fargo remediated, where applicable, borrowers for "loss of use funds" (i.e., money borrowers could have chosen to use elsewhere if the money had been timely and appropriately refunded).  Wells Fargo paid customers over $66 million for the loss of use of their funds for CPI policies force placed between 2005 and 2016.

167.    Moreover, Wells Fargo, during remediation, refunded borrowers an additional $40 million for CPI premiums that National General did not return to borrowers during the pendency of the CPI program.

168.    **Interest.**  Two kinds of interest accrued on a borrower's loan when a CPI policy was placed.  First, interest accrued on the loan principal.  Second, interest accrued on the CPI premium.  Although these two interest rates were separate charges, they were directly connected.

169.    When National General issued a CPI policy, the cost of the CPI premium was added to the borrower's loan, and corresponding CPI interest (the finance charge) began to accrue.  When a borrower submitted a loan payment, that payment did not go directly to the loan principal.  Wells Fargo allocated the borrower's payment first to the CPI interest, then the CPI premium, then the loan interest, and, finally, applied the balance to the loan principal.  This order of operations meant that the addition of CPI frequently caused the loan balance to remain high and, accordingly, for greater loan interest to accrue.

170.    National General knew that Wells Fargo charged CPI interest; knew that it would be added to the borrowers outstanding loan balance; and knew that it caused borrowers harm because borrowers called National General to complain about that additional interest.  National General did not refund borrowers for the CPI interest or loan interest that accrued.

171.    Wells Fargo paid customers over $17 million in its remediation process for CPI interest that accrued because of force-placed CPI policies.

172.    **Assessed Fees**:  Borrowers were sometimes also charged additional fees in connection with a false placement, including:

- late fees—fees assessed when the borrower was late on a payment;

- non-sufficient fund fees—fees assessed when the customer attempted to make a loan payment using an account with insufficient funds; and

- deferral fees—fees assessed when a borrower deferred a loan payment.

173.    National General knew about these fees, as (again) borrowers called in to complain about the impact the fees were having on their accounts.  National General did not refund borrowers for fees assessed in connection with CPI.

174.    Wells Fargo paid customers over $71 million in its remediation process for late fees that accrued because of force-placed CPI policies.

**B.      False Placements Caused Borrowers to Default on Their Loans, which Resulted in Wells Fargo Repossessing Their Cars.**

175.    False placements caused some borrowers to default on their loans, which led, in some cases, to repossession of their cars.

176.    As a result of National General's often unsuccessful Letter Cycle, some borrowers were unaware that CPI had been force-placed on their accounts and, thus, failed to increase their monthly loan payments to cover the CPI premiums and possible additional amounts of CPI interest and loan interest.  As a result, those borrowers unknowingly failed to pay the loan principal, resulting in defaults.

177.    When a loan went into default, Wells Fargo could exercise its right to repossess the car.  Placement of CPI on an account increased the repossession rate up to ten times and resulted in repossession 160 days sooner than accounts without CPI.

178.    Wells Fargo paid customers over $287 million in repossession-related expenses during its remediation process.

179.    Borrowers repeatedly complained to National General about improper repossessions and the harms the repossessions caused.  Among other harms, borrowers, in some

instances, were forced to pay for attorneys to help recover their cars; other means of transportation while their car was in Wells Fargo's possession; the cost of the repossession itself, which Wells Fargo charged to their account; and the deficiency balance, if the car was sold at auction.

      **1.**      **National General Falsely Placed CPI on Borrower 11's Account, Which Caused Her to Default on Her Loan and Led to Wells Fargo Repossessing Her Car.**

180.    On June 4, 2013, **BORROWER 11's** loan loaded to National General's system. On June 9, 2013, just five days later, National General received proof of **BORROWER 11's** active insurance policy that covered the period of May 25, 2013, through December 28, 2013. On March 6, 2014, National General received proof that **BORROWER 11's** active insurance policy had been extended to cover the period of December 28, 2013, through December 28, 2014. Despite this proof, National General failed to properly update **BORROWER 11's** account, causing its Letter Cycle to start.

181.    On October 5, 2014, National General sent **BORROWER 11** a letter falsely stating that "the insurance coverage on [her] financed vehicle [had] expired," which it had not, and requesting "evidence of adequate insurance with an effective date on or before 08/23/2014," which National General already had. On November 10, 2014, National General sent **BORROWER 11** a letter stating, "Our records indicated an absence of required insurance coverage since 08/23/2014. Since we have not received proof of the required coverage, we have exercised our contractual right to purchase insurance coverage." The letter falsely stated that **BORROWER 11** owed a $1,157 premium. In these letters, National General falsely represented to **BORROWER 11** that she owed money to Wells Fargo via the CPI premium, when she did not, and that she did not have the appropriate insurance, when she did.

182.    On November 9, 2014, National General falsely placed CPI on **BORROWER 11's** account.  In doing so, National General again represented to **BORROWER 11** that she owed money to Wells Fargo for the CPI premium, when she did not, and that she did not have the appropriate insurance, when she did.

183.    Upon information and belief, **BORROWER 11** was unaware that CPI had been placed on her account.  As such, she continued to pay her usual monthly payment, causing her to default on her loan.  On August 28, 2015, after the loan went into default, **BORROWER 11's** car was repossessed.  **BORROWER 11** and her insurance agent called National General and/or Wells Fargo multiple times over the next several days to try and get her car back and provide proof of insurance (again).

184.    For example, on August 31, **BORROWER 11's** agent called National General and verified coverage while, according to **BORROWER 11**'s attorney, **BORROWER 11** "spent the entire day on the phone with WFF [Wells Fargo Financial]" trying to get her car back from the repossession lot.  **BORROWER 11** called National General again on September 2, this time with her insurance agent, to verify coverage and complain.  National General's call notes state: "customer upset her car was repo'd and that she has been transferred with no clear answers."  Separately, National General again received proof of coverage via fax on August 28, 2015, September 2, 2015, and September 3, 2015.

185.    National General finally canceled the falsely placed CPI policy on September 4, 2015.  However, **BORROWER 11's** car was not released from the repossession lot, so she was forced to hire an attorney to help her get her car back.  On September 10, **BORROWER 11's** attorney made several attempts via phone and email to have **BORROWER 11's** car released but did not succeed.  It was not until September 14, after **BORROWER 11** had incurred attorney's

fees and hundreds of dollars in ride share and other transportation costs, that her car was returned to her. Once **BORROWER 11** got her car back, she had to pay to get it cleaned and replace items that had been stolen while it was in the repossession lot.

186.    In email exchanges between National General and Wells Fargo employees located in Pennsylvania, California, and North Carolina in December 2015, National General acknowledged that CPI was improperly placed on **BORROWER 11's** account due to its "incorrect document update . . . which resulted in repossession."

> **2.    National General Falsely Placed CPI on Borrower 12's Account, Which Caused Him to Default on His Loan and Led to Wells Fargo Repossessing His Car.**

187.    **BORROWER 12's** loan loaded to National General's system on February 11, 2014. **BORROWER 12** had an active insurance policy on his car, and his insurance carrier participated in EDI. Therefore, upon information and belief, National General would have had information available to it via its EDI systems demonstrating **BORROWER 12** had active coverage. Nevertheless, National General sent **BORROWER 12** a letter on March 18, 2014, stating that it "ha[d] not received insurance information," and requested evidence of insurance.

188.    On April 23, 2014, National General sent **BORROWER 12** another letter stating that it "[had] not received proof of required coverage"; its "records indicate[d] an absence of required insurance coverage since 02/04/2014;" and **BORROWER 12** owed $870 in premiums. In these letters, National General represented to **BORROWER 12** that he owed money to Wells Fargo when he did not, and that he did not have the appropriate insurance, when he did.

189.    That same day, National General false placed a CPI policy on **BORROWER 12's** account, effective February 4, 2014, through February 4, 2015. **BORROWER 12** was unaware

his payments had increased because his account was set to autopay, so he continued to pay his regular monthly payment. This caused his account to go into default.

190.    National General received additional proof of **BORROWER 12's** outside insurance on January 15, 2015. Nevertheless, National General did not cancel the policy, and **BORROWER 12's** car was repossessed on January 26, 2015.

191.    **BORROWER 12's** attorney reached out to Wells Fargo on February 10, 2015, threatening to file a lawsuit, and filed that lawsuit against Wells Fargo on March 5, 2015. On March 17, 2015, nearly two months after **BORROWER 12's** car was repossessed (and only after **BORROWER 12** hired an attorney), National General called **BORROWER 12's** insurance carrier and immediately confirmed **BORROWER 12** had active, outside insurance beginning February 28, 2014. National General subsequently flat canceled **BORROWER 12's** force-placed CPI policy.

192.    National General did not refund borrowers for the costs associated with default and repossession in the ordinary course, unless there were extenuating circumstances, such as a borrower lawsuit.

### C.    False Placements Negatively Impacted Borrower's Credit Scores.

193.    False placements also sometimes caused harm to borrowers' credit scores. As explained above, false placements caused borrowers to miss loan payments, become delinquent on their loans, and/or default on their loans. False placements also often caused the accrual of late and other associated fees.

194.    All of these events have the capacity to negatively impact a borrower's credit score. And National General knew the impact false placements had on borrowers' credit, as borrowers repeatedly complained to National General about such impact.

195.    National General did not refund borrowers for harm to credit scores or take these harms into account when calculating refunds.

196.    During its remediation process, Wells Fargo worked with credit bureaus to address adverse credit reporting related to force-placed CPI policies and return the customers to the position they would have been in but for any adverse impact.  To achieve this, Wells Fargo either updated the customer's payment history to that pre-CPI placement or suppressed the customer's payment history from the CPI billing date through the remediation date.

**D.    Wells Fargo Was Affected by National General's Scheme to Defraud, and National General Obtained Money from Wells Fargo.**

197.    Wells Fargo was also affected by National General's scheme to defraud.  Wells Fargo held the borrowers' loans and received the CPI premium payments directly from the borrower.

198.    Borrowers remitted the premiums for CPI to Wells Fargo, and Wells Fargo paid National General the amount of the premium in exchange for National General's CPI product, less any refunds.

199.    When National General canceled a CPI policy, it notified Wells Fargo, and, based on that notification, Wells Fargo refunded any premium owed back to the borrower.  In this regard, Wells Fargo served as a pass through for National General—placing CPI when notified to do so by National General and refunding the premium when National General directed it.

200.    Therefore, with each false placement, National General fraudulently obtained money from Wells Fargo in the amount of the CPI premium and affected Wells Fargo. Moreover, National General caused Wells Fargo to refund premiums.  And in connection with the Non-Cancel Borrowers, National General improperly retained the full premium, without providing a refund to Wells Fargo or the borrower.

201.    In addition, Wells Fargo paid National General a tracking fee of $0.10 per loan, reduced to $0.05 per loan on March 1, 2013.  National General earned at least $22.1 million in tracking fees from Wells Fargo during the Relevant Period.  However, National General's tracking process was broken, often resulting in inaccurate records, mailings sent to incorrect addresses, and a failure to reach borrowers over the phone, among other issues.  By obtaining these tracking fees, National General derived a pecuniary gain under false pretenses.

**COUNT I**
**FIRREA CIVIL MONETARY PENALTIES PREDICATED ON MAIL FRAUD**
**12 U.S.C. § 1833A; 18 U.S.C. § 1341**

202.    The United States realleges and incorporates the allegations contained in Paragraphs 1 through 201 above, as if fully set forth in this paragraph.

203.    In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1341 (mail fraud), affecting a federally insured financial institution, for which they are subject to a civil penalty.

204.    In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, acting separately or in concert with one another, engaged in a scheme to defraud in which, acting knowingly, recklessly, or in deliberate ignorance of the truth, they made false and misleading representations of material facts to borrowers and Wells Fargo.  In pursuit of this fraudulent

scheme, Defendants repeatedly engaged in dishonest and deceitful actions that deprived borrowers of something of value.

205.    In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, acting separately or in concert with one another, had an intent to defraud borrowers when, acting with an intent to deceive and in contemplation of actual harm to the property interest of the borrowers, they made false and misleading representations to borrowers and Wells Fargo.  When the Defendants made these representations, they knew they were false, or they were aware of a high probability that their representations were false, but nevertheless continued to engage in their scheme to defraud and consciously avoided confirming that suspicion.  Defendants also knew at the time that a necessary consequence of their fraudulent scheme, if successful, would be to injure borrowers, and they consciously intended for this injury to occur.

206.    In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, acting separately or in concert with one another, knowingly used the mails in furtherance of their scheme to defraud when they placed in any post office or authorized depository for mail matter, deposited, or caused to be deposited for delivery by the United States Postal Service or by private or commercial interstate carrier, *inter alia*, letters to borrowers during the Letter Cycle and bills to borrowers reflecting amounts owed for CPI premiums.  These mailings were at least incidental to an essential part of Defendants' scheme to defraud.

207.    In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, separately or in concert with one another, knowingly, recklessly, or in deliberate ignorance of the truth, made representations to borrowers and Wells Fargo that were materially false or misleading.

208.    The misrepresentations made in connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, had a natural tendency to influence and/or were capable of influencing the borrowers and Wells Fargo, as, for example, the misrepresentations prompted Wells Fargo to demand payment for the CPI policies from borrowers and the borrowers to pay premiums they did not actually owe.

209.    In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, the Defendants' acts of mail fraud affected a federally insured financial institution.

210.    In connection with some of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, Defendants' acts of mail fraud actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

211.    In connection with some of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, Defendants derived pecuniary gain from their acts of mail fraud.

212.    For each violation of 18 U.S.C. § 1341 as to each of the 640,000 Post-Bill Flat

Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat

Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, the

Defendants are liable for civil penalties up to the maximum amount authorized under FIRREA,

12 U.S.C. § 1833a(b)(3)(A).

## COUNT II
## FIRREA CIVIL MONETARY PENALTIES PREDICATED ON MAIL FRAUD
## 12 U.S.C. § 1833a; 18 U.S.C. § 1341

213.    The United States re-alleges and incorporates the allegations contained in

Paragraphs 1 through 201 above, as if fully set forth in this paragraph.

214.    In connection with each of the approximately 14,000 Non-Cancel Borrowers

occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**,

Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C.

§ 1341 (mail fraud), affecting a federally insured financial institution, for which they are subject

to a civil penalty.

215.    In connection with each of the approximately 14,000 Non-Cancel Borrowers

occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**,

Defendants, acting separately or in concert with one another, engaged in a scheme to defraud in

which, acting knowingly, recklessly, or in deliberate ignorance of the truth, they made false and

misleading representations of material facts to borrowers and Wells Fargo.  In pursuit of this

fraudulent scheme, Defendants repeatedly engaged in dishonest and deceitful actions that

deprived borrowers of something of value.

216.    In connection with each of the approximately 14,000 Non-Cancel Borrowers

occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**,

Defendants, acting separately or in concert with one another, had an intent to defraud borrowers

when, acting with an intent to deceive and in contemplation of actual harm to the property interest of the borrowers, they made false and misleading representations to borrowers and Wells Fargo. When the Defendants made these representations, they knew they were false, or they were aware of a high probability that their representations were false, but nevertheless continued to engage in their scheme to defraud and consciously avoided confirming that suspicion. Defendants also knew at the time that a necessary consequence of their fraudulent scheme, if successful, would be to injure borrowers, and they consciously intended for this injury to occur.

217. In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants, acting separately or in concert with one another, knowingly used the mails in furtherance of their scheme to defraud when they placed in any post office or authorized depository for mail matter, deposited, or caused to be deposited for delivery by the United States Postal Service or by private or commercial interstate carrier, *inter alia*, letters to borrowers during the Letter Cycle and bills to borrowers reflecting amounts owed for CPI premiums. These mailings were at least incidental to an essential part of Defendants' scheme to defraud.

218. In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants, separately or in concert with one another, knowingly, recklessly, or in deliberate ignorance of the truth, made representations to borrowers and Wells Fargo that were materially false or misleading.

219. The misrepresentations made in connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10,** had a natural tendency to influence and/or were capable of

influencing the borrowers and Wells Fargo, as, for example, the misrepresentations prompted Wells Fargo to demand payment for the CPI policies from borrowers and the borrowers to pay premiums they did not actually owe.

220.    In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, the Defendants' acts of mail fraud affected a federally insurance financial institution.

221.    In connection with most, if not all, of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants' acts of mail fraud actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

222.    In connection with most, if not all, of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants derived pecuniary gain from their acts of mail fraud.

223.    For each violation of 18 U.S.C. § 1341 as to each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, the Defendants are liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

### COUNT III
### FIRREA CIVIL MONETARY PENALTIES PREDICATED ON WIRE FRAUD
### 12 U.S.C. § 1833a; 18 U.S.C. § 1343

224.    The United States re-alleges and incorporates the allegations contained in Paragraphs 1 through 201 above, as if fully set forth in this paragraph.

225.    In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants,

acting separately or in concert with one another, committed violations of 18 U.S.C. § 1343 (wire fraud), affecting a federally insured financial institution, for which they are subject to a civil penalty.

226.    In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, acting separately or in concert with one another, engaged in a scheme to defraud in which, acting knowingly, recklessly, or in deliberate ignorance of the truth, they made false and misleading representations of material facts to borrowers and Wells Fargo.  In pursuit of this fraudulent scheme, Defendants repeatedly engaged in dishonest and deceitful actions that deprived borrowers of something of value.

227.    In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, acting separately or in concern with one another, had an intent to defraud borrowers when, acting with an intent to deceive and in contemplation of actual harm to the property interest of the borrowers, they made false and misleading representations to borrowers and Wells Fargo.  When the Defendants made these representations, they knew they were false, or they were aware of a high probability that their representations were false, but nevertheless continued to engage in their scheme to defraud and consciously avoided confirming that suspicion.  Defendants also knew at the time that a necessary consequence of their fraudulent scheme, if successful, would be to injure borrowers, and they consciously intended for this injury to occur.

228.     In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, acting separately or in concert with one another, knowingly transmitted or caused to be transmitted  interstate wires in furtherance of their scheme to defraud when they, *inter alia*, (1) exchanged calls with borrowers, insurance agents, and carriers regarding the placement of CPI; (2) electronically exchanged information with Wells Fargo regarding CPI policies via an internet-based website; and (3) communicated with Wells Fargo via email regarding CPI policies and, often, falsely placed CPI policies.  These wires were at least incidental to an essential part of Defendants scheme to defraud.

229.     In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, separately or in concert with one another, knowingly, recklessly, or in deliberate ignorance of the truth, made representations to borrowers and Wells Fargo that were materially false or misleading.

230.     The misrepresentations made in connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, had a natural tendency to influence and/or were capable of influencing the borrowers and Wells Fargo, as, for example, the misrepresentations prompted Wells Fargo to demand payment for the CPI policies from borrowers and the borrowers to pay premiums they did not actually owe.

231.    In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, the Defendants acts of wire fraud affected a federally insurance financial institution.

232.    In connection with some of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, Defendants acts of wire fraud actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

233.    In connection with some of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, Defendants derived pecuniary gain from their acts of wire fraud.

234.    For each violation of 18 U.S.C. § 1343 as to each of the 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, the Defendants are liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

### COUNT IV
### FIRREA CIVIL MONETARY PENALTIES PREDICATED ON WIRE FRAUD
### <u>12 U.S.C. § 1833a; 18 U.S.C. § 1343</u>

235.    The United States re-alleges and incorporates the allegations contained in Paragraphs 1 through 201 above, as if fully set forth in this paragraph.

236.    In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1343 (wire fraud), affecting a federally insured financial institution, for which they are subject to a civil penalty.

237.    In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants, acting separately or in concert with one another, engaged in a scheme to defraud in which, acting knowingly, recklessly, or in deliberate ignorance of the truth, they made false and misleading representations of material facts to borrowers and Wells Fargo.  In pursuit of this fraudulent scheme, Defendants repeatedly engaged in dishonest and deceitful actions that deprived borrowers of something of value.

238.    In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants, acting separately or in concert with one another, had an intent to defraud borrowers when, acting with an intent to deceive and in contemplation of actual harm to the property interest of the borrowers, they made false and misleading representations to borrowers and Wells Fargo.  When the Defendants made these representations, they knew they were false, or they were aware of a high probability that their representations were false, but nevertheless continued to engage in their scheme to defraud and consciously avoided confirming that suspicion. Defendants also knew at the time that a necessary consequence of their fraudulent scheme, if successful, would be to injure borrowers, and they consciously intended for this injury to occur.

239.    In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants, acting separately or in concert with one another, knowingly transmitted or caused to be transmitted  interstate wires in furtherance of their scheme to defraud when they, *inter alia*, (1) exchanged calls with borrowers, insurance agents, and carriers regarding the placement of CPI; (2) electronically exchanged information with Wells Fargo regarding CPI policies via an

internet-based website; and (3) communicated with Wells Fargo via email regarding CPI policies and, often, falsely placed CPI policies. These wires were at least incidental to an essential part of Defendants scheme to defraud.

240.    In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants, separately or in concert with one another, knowingly, recklessly, or in deliberate ignorance of the truth, made representations to borrowers and Wells Fargo that were materially false or misleading.

241.    The misrepresentations made in connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10,** collateral, had a natural tendency to influence and/or were capable of influencing the borrowers and Wells Fargo, as, for example, the misrepresentations prompted Wells Fargo to demand payment for the CPI policies from borrowers and the borrowers to pay premiums they did not actually owe.

242.    In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, the Defendants acts of wire fraud affected a FIFI.

243.    In connection with most, if not all, of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants acts of wire fraud actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

65

244. In connection with most, if not all, of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants derived pecuniary gain from their acts of wire fraud.

245. For each violation of 18 U.S.C. § 1343 as to each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, the Defendants are liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

## COUNT V
## FIRREA CIVIL MONETARY PENALTIES PREDICATED ON BANK FRAUD
## <u>12 U.S.C. § 1833a; 18 U.S.C. § 1344(2)</u>

246. The United States re-alleges and incorporates the allegations contained in Paragraphs 1 through 201 above, as if fully set forth in this paragraph.

247. In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1344(2) (bank fraud) for which they are subject to a civil penalty.

248. In connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, Defendants, acting separately or in concert with one another, knowingly executed, or attempted to execute, a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, one or more financial institutions, by means of materially false and fraudulent pretenses, representations, and promises.

249.     The misrepresentations made to Wells Fargo in connection with each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, had a natural tendency to influence and/or were capable of influencing Wells Fargo, as, for example, the misrepresentations prompted Wells Fargo to pay Defendants for CPI premiums they did not owe; demand payment from borrowers for false placements; and/or remediate borrowers for premiums paid for and harm caused by CPI policies that were duplicative.

250.     In connection with some of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, Defendants acts of bank fraud actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

251.     In connection with some of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, Defendants derived pecuniary gain from their acts of mail fraud.

252.     For each violation of 18 U.S.C. § 1344(2) as to each of the approximately 640,000 Post-Bill Flat Cancels occurring during the Relevant Period, including, but not limited to, the Post-Bill Flat Cancels of CPI policies placed on the collateral of **BORROWERS 1, 3, 4, 6, 7, 11, and 12**, the Defendants are liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

**COUNT VI**
**FIRREA CIVIL MONETARY PENALTIES PREDICATED ON BANK FRAUD**
**12 U.S.C. § 1833a; 18 U.S.C. § 1344(2)**

253.     The United States re-alleges and incorporates the allegations contained in Paragraphs 1 through 201 above, as if fully set forth in this paragraph.

254.    In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1344(2) (bank fraud) for which they are subject to a civil penalty.

255.    In connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants, acting separately or in concert with one another, knowingly executed, or attempted to execute, a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, one or more financial institutions, by means of materially false and fraudulent pretenses, representations, and promises.

256.    The false representations made to Wells Fargo in connection with each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, had a natural tendency to influence and/or were capable of influencing Wells Fargo, as, for example, the misrepresentations prompted Wells Fargo to pay Defendants for CPI premiums they did not owe; demand payment from borrowers for false placements; and/or remediate borrowers for premiums paid for and harm caused by CPI policies that were duplicative.

257.    In connection with most, if not all, of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants acts of bank fraud actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

258.     In connection with most, if not all, of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, Defendants derived pecuniary gain from their acts of bank fraud.

259.     For each violation of 18 U.S.C. § 1344(2) as to each of the approximately 14,000 Non-Cancel Borrowers occurring during the Relevant Period, including, but not limited to, **BORROWERS 8, 9, and 10**, the Defendants are liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

WHEREFORE, the United States requests judgment against all Defendants for the maximum penalty allowed under FIRREA, 12 U.S.C. § 1833a(b), in an amount to be determined at trial, together with pre-judgment and post-judgment interest, all allowable costs and attorneys' fees, and any other relief the Court deems just and proper.

The United States respectfully demands a jury trial for all issues so triable.

This 24th day of July.

Respectfully submitted,

BRIAN BOYNTON
Principal Deputy Assistant Attorney General

*/s/  Lindsay A DeFrancesco*
JAMIE ANN YAVELBERG
ALLISON CENDALI
LINDSAY DEFRANCESCO
LAURA E. HILL
United States Department of Justice
Civil Division, Fraud Section
175 N Street, NE, 9th Floor
Washington, DC 20002
(202) 532-5682
(202) 514-7900
Email: Lindsay.A.DeFrancesco@usdoj.gov
DC Bar No. 1600420

69

ERIC G. OLSHAN
United States Attorney

ADAM FISCHER
Assistant United States Attorney
Western District of PA
Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7343
(412) 644-6995
Adam.Fischer@usdoj.gov
PA ID No. 314548

*Attorneys for the United States of America*