IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   *Plaintiff,*<br><br> v.<br><br>NATIONAL GENERAL HOLDINGS<br>CORP., *et al*,<br><br>   *Defendants.* | Civil Action No. 2:24-cv-1063<br><br>Hon. William S. Stickman IV |

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

   Plaintiff, the United States of America ("the Government"), brought this action against National General Holdings Corp. ("NGHC"); National General Insurance Company ("NGIC"); National General Lender Services, Inc. ("NGLS"); and Newport Management Corporation ("Newport") (collectively "National General"). (ECF No. 1). At Counts I and II, the Government alleges that National General committed mail fraud in violation of 18 U.S.C § 1341, affecting a federally insured financial institution, for which it is subject to civil penalties under the Financial Institutions, Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a. (*Id.* ¶¶ 202-23). At Counts III and IV, the Government alleges that National General committed wire fraud in violation of 18 U.S.C. § 1343, affecting a federally insured financial institution, for which it is subject to civil penalties under FIRREA. (*Id.* ¶¶ 224-45). At Counts V and VI, the Government alleges that National General committed bank fraud in violation of 18 U.S.C. § 1344(2), affecting a federally insured financial institution, for which it is subject to civil penalties under FIRREA. (*Id.* ¶¶ 246-59). National General filed a Motion to Dismiss (ECF No. 18) and

supporting brief (ECF No. 18-1) requesting that the Court dismiss the complaint. For the reasons set forth below, the Court will deny National General's motion.

## I.    FACTUAL BACKGROUND

NGHC is incorporated under the laws of Delaware and is the holding company for numerous subsidiaries. (ECF No. 1, ¶ 13). NGLS is incorporated under the laws of Delaware and is a wholly owned subsidiary of NGHC. (*Id.* ¶ 15). NGIC is incorporated under the laws of Missouri and is a subsidiary of NGHC. (*Id.* ¶ 16). Newport is incorporated under the laws of California and is a wholly owned subsidiary of NGLS. (*Id.* ¶ 17). Wells Fargo Bank, N.A. ("Wells Fargo"), a relevant non-party, is a federally insured financial institution with operations throughout the United States, and its business includes originating and servicing automobile loans. (*Id.* ¶ 19). Consumers financing vehicles through Wells Fargo borrowed, on average, approximately $15,000 for mostly used older vehicles. (*Id.* ¶ 2). The vehicles served as collateral for the loans. (*Id.*).

This litigation centers around Collateral Protection Insurance ("CPI"). CPI, also referred to as physical damage insurance, is a form of vehicle insurance that covers only the cost of damage to the insured vehicle, not liability damage from events such as collisions. (*Id.* ¶ 27). It protects only the collateral for a vehicle loan. (*Id.*). When a borrower obtained a vehicle loan through Wells Fargo, Wells Fargo required the borrower to obtain and maintain insurance on the vehicle. (*Id.* ¶ 30). Borrowers satisfied this requirement by purchasing either comprehensive and collision insurance or a CPI policy. (*Id.*).

From April 24, 2008, through September 30, 2016 ("the relevant period"), Wells Fargo contracted with National General to track and place CPI on vehicles financed through Wells Fargo. (*Id.* ¶ 1). NGHC, NGIC, NGLS, and Newport each had roles in managing and conducting National General's CPI program, and often, those roles were allegedly indistinguishable. (*Id.* ¶ 75).

National General's objective was to determine whether the borrower had the requisite insurance, and if not, place National General's CPI product on the loan. (*Id.* ¶ 32). Once the CPI product was placed, Wells Fargo, with limited exceptions, added the cost of the premium to the borrower's loan. (*Id.*). Wells Fargo paid National General the cost of the CPI coverage. Wells Fargo was reimbursed by borrowers. CPI was often referred to as "force-placed" insurance because a borrower did not choose to purchase National General's product – it was added to the borrower's premium if they failed to comply with Wells Fargo's loan requirements by obtaining outside insurance. (*Id.*). If National General obtained proof of outside insurance after force-placing the CPI, it was required to cancel the CPI policy and refund the premium to Wells Fargo (who, in turn, refunded borrowers). (*Id.* ¶ 40). National General allegedly earned an average of $1,124 per CPI policy during the relevant period. (*Id.* ¶ 36). National General earned at least $489.5 million in net written premiums from borrowers for force-placed CPI polices in connection with Wells Fargo loans during the relevant period. (*Id.*). National General also earned a tracking fee for attempting to identify outside insurance on every active loan sent from Wells Fargo. (*Id.* ¶ 37). Initially, that fee was $0.10 per loan, but it was reduced to $0.05 per loan on March 1, 2013. (*Id.*). National General earned at least $22.1 million in tracking fees from Wells Fargo during the relevant period. (*Id.*). According to the Government, Wells Fargo was National General's largest CPI client for vehicle loan lending. (*Id.* ¶ 38). Wells Fargo's CPI business allegedly generated 90-95% of National General's revenue for its CPI product. (*Id.*).

The core of the Government's allegations is that National General, on a massive scale, was knowingly and recklessly force-placing CPI on borrowers who did not need CPI – they had the requisite insurance. One integral part of the alleged scheme was the letter cycle process ("the Letter Cycle"), which constituted National General's efforts to determine whether a borrower was

insured. (*Id.* ¶ 45). For new loans, National General deemed a loan uninsured if it did not obtain what it considered to be sufficient evidence of insurance for the new loan through hard copy or electronic documents. (*Id.*). For existing loans, it deemed a loan uninsured if National General received proof that an active insurance policy expired, had been canceled, or it did not receive affirmative proof that an outside policy was extended. (*Id.*). The Letter Cycle consisted of mailing two letters to the borrower and attempting, at most, three calls to the insurance agent, insurance carrier, or borrower, depending on certain criteria. (*Id.* ¶ 46). National General sent the first letter, a template letter called the "Insurance Request Letter," about 42-46 days after the date National General deemed the loan uninsured. (*Id.*). In the letter, National General notified borrowers that it had not received insurance information for the financed vehicle or that the known insurance coverage had expired, lapsed, or been canceled, and asked that the borrower provide proof of insurance. (*Id.*).

Approximately 21 days after sending the Insurance Request Letter, National General customer service representatives began attempting telephone calls. (*Id.* ¶ 47). Until March 1, 2015, National General attempted between one to three calls to obtain borrowers' insurance information. (*Id.*). National General required more than eight data points to verify outside coverage over the telephone, most of which were not readily available from, for example, an insurance card. (*Id.* ¶ 105). Rather, borrowers generally were required to read their insurance information from their policy's declaration page. (*Id.*). These data points included: the year, make, and model of the vehicle; the last 5 digits of the VIN; the policy number; the effective date of the policy; the policy expiration date; and the comprehensive and collision deductible. (*Id.* ¶ 106). If any of these pieces of information were missing, National General deemed the proof insufficient, making it difficult for a borrower or agent to stop National General from force-placing CPI. (*Id.*)

After March 1, 2015, National General largely eliminated calls to borrowers, only calling borrowers when no insurance information had been received. (*Id.*).

If National General did not receive what it deemed sufficient evidence of a borrower's insurance coverage after sending the Insurance Request Letter and making calls, it sent a second template letter, the "Coverage Issued Letter," about 77-81 days after the uninsured date. (*Id.* ¶ 50). National General attached a Certificate of Insurance to the Coverage Issued Letter, which marked the "issuance" of the CPI policy. (*Id.*). In the Coverage Issued Letter, National General informed borrowers that a one-year CPI policy was being purchased for them; an annual premium amount would be owed; and that the CPI policy would be backdated to the uninsured date. (*Id.* ¶ 50). The letter also stated that the entire annual premium plus interest (also referred to as a finance charge) would be due in monthly installments, unless the borrower notified National General that it was paying the annual CPI premium up front, or the borrower submitted proof of insurance. (*Id.* ¶ 52). If National General did not obtain proof of insurance within 23-27 days of sending the Coverage Issued Letter to the borrower, it notified Wells Fargo that CPI should be placed by sending Wells Fargo an electronic file via interstate wire that listed the loans that National General determined required CPI. (*Id.* ¶ 57). Wells Fargo then processed the file and, in most cases, paid National General for the CPI premium and charged the borrower by adding the CPI premium to the loan. (*Id.* ¶ 58).

The Government alleges that the letters and telephone calls misled borrowers who had outside insurance coverage by stating they did not have the requisite insurance, had not provided the required proof of coverage, and owed a CPI premium. (*Id.* ¶ 53). The Government further alleges that the Coverage Issued Letter further misled borrowers by stating that they owed a particular premium when they did not. (*Id.*). The Government contends that

Force-placing CPI was the default outcome for National General's systems. For example, National General force-placed its insurance regardless of whether letters to the borrower had been returned to National General as undeliverable or whether National General had ever spoken to the borrower, the borrower's insurance agent, or their insurance carrier. In some instances, National General force-placed its insurance even if a borrower's insurance agent had confirmed outside coverage but, for example, stated they did not have the documents on hand. National General also force-placed its insurance even if it had received proof of insurance but the borrower or the borrower's insurance agent had failed to include the date the vehicle was added to the outside policy. National General force-placed insurance in cases where a borrower had verbally confirmed they had outside coverage and provided the insurance agent's contact information, but the agent was unavailable at the time National General called.

(*Id.* ¶ 59). If, after issuing a CPI policy, National General determined the borrower had insurance during some or all of the CPI coverage period, National General canceled the CPI policy. (*Id.* ¶ 63). From 2010 to 2016, National General allegedly refunded borrowers between 75 and 95% of the time and issued over $1.5 billion in refunds. (*Id.* ¶ 68). The Government alleges that "[t]he sheer volume of refunds served as a bright red flag that National General's systems were broken." (*Id.*).

National General and Wells Fargo regularly exchanged information regarding the tracking and placement of CPI policies. National General made information available to Wells Fargo about the loans in its portfolio on a daily, weekly, and monthly basis via ClientSource, an internet-based portal owned and operated by National General. (*Id.* ¶ 70). It served as a method for Wells Fargo employees to lookup information about specific borrowers and their accounts, giving Wells Fargo access to the information stored in National General's internal systems. (*Id.* ¶ 71). Further, it functioned as a data interchange platform. (*Id.* ¶ 72). Through ClientSource, National General made available to Wells Fargo summary reports and insurance documentation. (*Id.*). The reports contained loan-level and summary information about borrowers, collateral, and CPI polices. (*Id.*).

The Government contends that National General knowingly and recklessly "falsely" placed between 1.2 and 2.1 million CPI policies during the relevant period. (*Id.* ¶ 79). Between 640,000 and 1.4 million of those false placements allegedly resulted in charges to borrowers. (*Id.*). In connection with each false placement, National General allegedly made statements that misrepresented to Wells Fargo and/or the borrower that the borrower needed CPI when they did not, and that the borrower owed Wells Fargo money when they did not. (*Id.* ¶ 80). National General allegedly made these material misrepresentations in the letters National General sent to borrowers; in the calls National General made to borrowers; in the communications and files National General sent to Wells Fargo regarding CPI; and in the borrowers' loan statements, which once CPI was placed, reflected increased amounts to account for the cost of the CPI policy. (*Id.*). The Government alleges that systemic issues with National General's tracking and placement processes, of which National General was aware, caused these false placements. (*Id.* ¶ 81). Rather than attempt to improve its operations, for a decade, National General allegedly opted to continue falsely placing and charging for CPI. (*Id.*).

The Government alleges that National General (1) force-placed CPI even when it knew that borrowers did not receive the letters notifying them of insurance requirements or requesting policy information, (*id.* ¶ 84); (2) force-placed CPI without allowing borrowers adequate time to provide their insurance, (*id.* ¶ 92); (3) maintained an ineffective telephone call notification procedure, (*id.* ¶ 97); (4) established burdensome and complex requirements for borrowers to escape its force-placed CPI, (*id.* ¶ 104); and (5) failed to obtain and process available insurance information, (*id.* ¶ 110). The Government contends that National General knew, or should have known, from the sheer volume of policies it canceled and the premiums it had to refund that it was falsely placing CPI. (*Id.* ¶ 123).

## II. STANDARD OF REVIEW

### A. Rule 12(b)(6)

A motion to dismiss filed under Federal Rule of Civil Procedure ("Rule") 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all well-pleaded factual allegations as true and view them in the light most favorable to a plaintiff. *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Although a court must accept the allegations in the complaint as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal citations omitted).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is present when a plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts lead to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

### III.  ANALYSIS

**A. Plausible Scheme to Defraud/False or Fraudulent Misrepresentations**

National General argues that the Government failed to sufficiently plead that National General made *any* false or fraudulent representations. (ECF No. 18-1, p. 22). National General contends that the complaint alleges three categories of statements: (1) statements from National General to borrowers; (2) statements by National General to Wells Fargo; and (3) statements by Wells Fargo to borrowers. (*Id.*). National General argues that none of these alleged statements are sufficiently pled as false or fraudulent and therefore, the entire complaint should be dismissed. (*Id.*). The Government counters that a false or fraudulent statement is not an element of mail, wire, or bank fraud. (ECF No. 26, p. 18). The Government contends that it properly pled a scheme to defraud. The Court holds that the Government sufficiently pled a false or fraudulent misrepresentation as required by the mail, wire, and bank fraud statutes.

1. *The Elements of Mail, Wire, and Bank Fraud*

The elements necessary to establish a claim for mail or wire fraud are: (1) a scheme to defraud; (2) the use of the mails or wires for the purpose of executing the scheme; and (3) fraudulent intent. *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002).[1] Wire fraud also has an interstate commerce component that must be satisfied. 18 U.S.C. § 1343. The parties dispute whether the scheme to defraud must be executed through a false or fraudulent misrepresentation. The Court holds that a false or fraudulent misrepresentation is required by both the mail and wire fraud statutes. However, the United States Court of Appeals for the Third Circuit has interpreted the "false or fraudulent misrepresentation" requirement broadly. The Court will do so here.

---

[1] Cases construing mail fraud are applicable to wire fraud because the mail and wire fraud statutes are identical except for the method used to disseminate the fraud. *United States v. Bentz*, 21 F.3d 37, 40 (3d Cir. 1994)

"A scheme to defraud means any deliberate plan of action or course of conduct by which someone intends to deceive or cheat another or by which someone intends to deprive another of something of value." *Coleman v. Commonwealth Land Title Ins. Co.*, 684 F. Supp. 2d 595, 614-15 (E.D. Pa. 2010). In *United States v. Frankel*, 721 F.2d 917, 921 (3d Cir. 1983), the Third Circuit stated that "[s]chemes to defraud come within the scope of the statute even absent a false representation." However, in cases following *Frankel*, the Third Circuit limited this statement: "Under the mail fraud statute, a scheme or artifice to defraud need not be fraudulent on its face but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991). *Frankel* has come to stand for the proposition that the scheme need not involve *affirmative* misrepresentations. However, "the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Id.* (internal citations omitted). "Express falsehoods lie at fraud's core," but as stated above, the misrepresentation need not be facially fraudulent or false. *United States v. Ferriero*, 866 F.3d 107, 120 (3d Cir. 2017) (quoting *United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011)). "Rather, a fraudulent or false representation 'may be affected by deceitful statements of half-truths or the concealment of material facts.'" *Id.*; *Coleman*, 684 F. Supp. 2d. at 615 (stating "the accused need not misrepresent any fact since all that is necessary is that the scheme be reasonably calculated to deceive person[s] of ordinary prudence and comprehension").[2]

---

[2] Although the parties mentioned bank fraud in their briefs, the majority of their arguments center around whether mail and wire fraud require a false or fraudulent representation. For this reason, the Court's analysis focuses on this issue. Nonetheless, the Court notes that the bank fraud statute similarly prohibits any "scheme or artifice to defraud a financial institution" or to obtain any property of a financial institution "by false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. Thus, the false or fraudulent representation requirement also applies to bank fraud.

2. *Sufficiency of the Allegations Contained in the Complaint*

The Government sufficiently pled that National General engaged in a scheme to defraud by means of false or fraudulent representations as required by the mail, wire, and bank fraud statutes. Assessing whether a communication is fraudulent is a highly contextual inquiry. *See United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978) (observing that in the inquiry into "whether [a scheme] [i]s fraudulent in nature, there are no hard and fast rules of law to apply"); *see also Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 189 (2016) (concluding disputed claims, though technically true, "were clearly misleading in context"). Therefore, it is an issue that the factfinder – not the Court – is particularly well-suited to assess. *Ferriero*, 866 F.3d at 122.

The Government alleged that National General made fraudulent misrepresentations, false or deceitful statements, and half-truths through (1) the letters sent and calls exchanged with borrowers and (2) information sent to Wells Fargo. (ECF No. 1, ¶¶ 46, 48, 51-52). The Government highlights the Coverage Issued Letter as an example of a fraudulent misrepresentation sent to borrowers. (ECF No. 26, p. 21). As discussed above, the Coverage Issued Letter informed the borrower of the premium owed for the CPI coverage. (ECF No. 1, ¶ 53). Likewise, the bill sent to borrowers reflected an increase in the amount owed due to the addition of CPI coverage. (*Id.* ¶ 156). The Government argues that when a borrower had outside insurance – and did not actually need CPI – the statements in the mailings and telephone calls were false or misleading. (ECF No. 26, p. 21). According to the Government, the borrowers should not have owed a premium (because they did not need CPI), but the communications indicated that they did. Thus, the communications were misrepresentations or omissions "reasonably calculated to deceive person[s] of ordinary prudence and comprehension," *see Coleman*, 684 F. Supp. 2d. at 615.

Likewise, the Government argues that it properly alleged false misrepresentations National General made to Wells Fargo. (*Id.* at 22). The Government contends that the files National General sent to Wells Fargo detailing where CPI was placed were false or misleading because some of the borrowers included did not actually require CPI. (*Id.*); (ECF No. 1, ¶¶ 57-58, 73). These lists allegedly misled Wells Fargo to believe that CPI was required for certain loans when it was not – causing Wells Fargo to pay National General CPI premiums for insurance that were not required. (ECF No. 26, p. 22).

National General argues that its statements to borrowers were not literally false. (ECF No. 18-1, p. 23). The statements in the Coverage Issued Letter indicated that National General's "records indicate an absence of required insurance coverage." (*Id.*). National General argues that these statements were factually true. Their records may have been inaccurate, but the letters truthfully reflected the state of its records. According to National General, the Government disputes the accuracy of its records – not the truthfulness of its statements in the Letter Cycle and customer telephone calls. (*Id.*). National General advances a similar argument regarding the bank fraud related counts. It argues that its statements to Wells Fargo were not false or fraudulent because, while the CPI placements may have been improper, its statements to Wells Fargo were literally truthful as they pertained to National General's records. (*Id.* at 25-26). National General's records indicated that a borrower needed coverage, so CPI was placed, and that information was relayed to Wells Fargo. (*Id.*).

*Coleman* is instructive on this point. In *Coleman*, through various title agents, the defendant allegedly misrepresented the amount of money owed for title insurance. *Coleman*, 685 F. Supp. 2d at 602. The crux of the plaintiffs' allegations was that the defendant overcharged homeowners who purchased title insurance by charging a default higher rate of insurance (instead

of a lower rate which applied to the kind of title insurance required of a homeowner as part of a mortgage transaction). *Id.* The rate charged appeared on a HUD-1 settlement statement that the buyers of the property signed at closing. *Id.* at 604. The parties disputed whether the HUD-1 settlement statements were misrepresentations or accurate statements of the amount that the plaintiffs paid. *Id.* at 615. The defendant maintained that the HUD-1 settlement statements were no more than a receipt. *Id.* The court found that the HUD-1 settlement statements contained misrepresentations, even if they accurately reflected the amount the plaintiffs paid, because they misled the plaintiffs into believing that the correct premium was charged. *Id.*

Likewise, even if both the letters and telephone calls to borrowers, and the lists sent to Wells Fargo, were literally accurate, the communications misrepresented reality – certain borrowers had insurance and did not owe CPI premiums despite the state of National General's records. Viewing the well-pled allegations in the light most favorable to the Government (as the Court must do on a motion to dismiss) the Court holds that the alleged representations were sufficient to satisfy the false or fraudulent misrepresentation requirement of the mail, wire, and bank fraud statutes. Affirmative false statements are not required. Stating that borrowers owed premiums (to both borrowers and Wells Fargo) that they should not have owed was a step in the alleged scheme to defraud, the full parameters of which will be developed through discovery.

### 3.  Materiality of the Representations

National General argues that the Government did not plead a *materially* false or fraudulent statement because it did not plead how the alleged misrepresentations influenced borrowers or Wells Fargo. (ECF No. 18-1, p. 27). In relation to the statements to borrowers, National General argues that the Government did not identify what decision by borrowers could have been influenced by statements regarding the status of their insurance and/or warnings that CPI would

13

be placed absent sufficient proof of coverage. (*Id.* at 28). If anything, National General argues, the Letter Cycle and telephone calls to borrowers should have prompted action by borrowers to avoid CPI placement. (*Id.*).

The Government counters that it is not required to plead materiality of a *specific* false representation. (ECF No. 26, p. 31). Instead, it is required to plead the materiality of the entirety of the scheme to defraud. (*Id.*). The Government contends that National General's scheme was material to Wells Fargo because it caused Wells Fargo to demand payment from borrowers for CPI premiums that they did not owe, and prompted Wells Fargo to pay National General for CPI that should not have been issued. (*Id.*). National General's scheme was allegedly material to borrowers because it influenced borrowers to pay premiums that they should not have owed. (*Id.* at 32). In the alternative, the Government argues that it pled material misrepresentations to borrowers and Wells Fargo. (*Id.*). The Court holds that the Government adequately pled materiality of the scheme for the purposes of the mail, wire, and bank fraud statutes.

In *Neder v. United States*, 527 U.S. 1 (1999), the Supreme Court of the United States held that materiality is an element of a scheme or artifice to defraud under the federal mail, wire, and bank fraud statutes. A false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 U.S. at 16. The test for materiality is an objective test considering a misrepresentation's capacity to influence a reasonable borrower or financial institution. *United States v. Santos*, 2022 WL 1698171, at *3 (D.N.J. Mar. 22, 2022). It is not necessary to show that the intended victim was induced or misled by the misrepresentation. Further, the Government need not plead the materiality of a specific falsehood or misrepresentation. *United States v. Woods*, 335 F.3d 993,

999-1000 (9th Cir. 2003). It is the materiality of the scheme or artifice as a whole that must be alleged. *Id.*; *United States v. Omer*, 395 F.3d 1087, 1089 (9th Cir. 2005).[3]

The Government adequately pled that the scheme to defraud borrowers and Wells Fargo was material. The complaint sufficiently describes the collective effect of National General's alleged communications with, and misrepresentations to, borrowers and Wells Fargo. National General's letters and telephone calls informing borrowers that they did not have the required insurance to comply with the terms of their vehicle loans were capable of influencing a reasonable borrower to pay premiums for CPI – even if CPI was not actually required. Moreover, National General's alleged communications with Wells Fargo informing Wells Fargo of which loans it owed CPI premiums on were capable of influencing a reasonable financial institution to pay National General for the force-placed CPI.

It is immaterial whether some borrowers did not receive National General's communications. The test is not whether borrowers were actually influenced by the communications but whether the communications were capable of influencing a reasonable person in the borrowers' shoes. Further, National General's argument that its misrepresentations could not have been material because they should have prompted action by the buyer to avoid CPI placement is not persuasive at this stage of litigation. Communications that may contribute to the uncovering or thwarting of a fraudulent scheme may still support a mail or wire fraud charge.

---

[3] National General argues that the Third Circuit has embraced an approach requiring specific statements to be material – not the scheme collectively. (ECF No. 18-1, pp. 26-27). National General cites two non-precedential opinions to support this argument. National General misinterprets the cited cases as they do not stand for the proposition that materiality must be pled on a statement-by-statement basis. *See United States v. Lucas*, 709 F. App'x 119, 123 (3d Cir. 2017); *United States v. Yujie Ding*, 756 F. App'x 126, 128 (3d Cir. 2018). National General is incorrect in arguing that the Third Circuit has required pleadings to outline the materiality of specific representations or statements.

*United States v. Frey*, 42 F.3d 795, 799 (3d Cir. 1994); *United States v. Daniel*, 329 F.3d 480, 486 (6th Cir. 2003) ("[A]ctual reliance is not required for mail or wire fraud.").

### 4. Knowing Participation in the Scheme to Defraud

National General argues that the complaint must be dismissed because it does not plead that National General knew its statements to borrowers and Wells Fargo were false at the time they were made. (ECF No. 18-1, p. 31). Further, National General argues that it provided Wells Fargo with regular updates on a variety of topics including the number of CPI cancellations and loan-level and summary information about borrowers, collateral, and CPI policies. (*Id.* at 31). The Government argues that the issue is not whether National General acted knowingly in making any *specific* misrepresentation, but whether it acted knowingly with respect to the overarching scheme. (ECF No. 26, p. 30). The Court holds that the Government adequately pled that National General knowingly engaged in a scheme to defraud borrowers and Wells Fargo as proscribed by the mail, wire, and bank fraud statutes.

To properly allege mail, wire, and bank fraud, the Government must plead that National General knowingly engaged in a scheme to defraud. *United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005); *see also Genty v. Resolution Trust Corp.*, 937 F.2d 899, 908–09 (3d Cir. 1991) ("When . . . liability is premised on violations of the federal mail fraud statute . . . the defendants must have knowledge of the illicit objectives of the fraudulent scheme and willfully intend that those larger objectives be achieved."). Unwitting participation in a fraudulent scheme is not criminal under the mail, wire, and bank fraud statutes. "[T]he relevant inquiry is not whether the defendant acted knowingly in making *any* misstatement, but whether [it] did so with respect to the overarching fraudulent scheme . . . ." *Dobson*, 419 F.3d at 237 (emphasis in original) (citing *Pearlstein*, 576 F.2d at 537.

Here, the Government alleged that National General knowingly and recklessly falsely placed between 1.2 and 2.1 million CPI policies during the relevant period.  (ECF No. 1, ¶ 79).  In connection with each false placement, National General allegedly made misleading statements to Wells Fargo and/or the borrower that the borrower needed CPI when they did not, and that the borrower owed Wells Fargo money when they did not.  (*Id.* ¶ 80).  National General allegedly made these material misrepresentations "in the letters National General sent to borrowers; in the calls National General made to borrowers; in the communications and files National General sent to Wells Fargo regarding CPI; and in the borrowers' loan statements, which once CPI was placed, reflected increased amounts to account for the cost of the CPI policy." (*Id.*).  The Government pled that National General was or should have been aware that their statements to Wells Fargo and borrowers were misleading because there were systemic issues with National General's CPI tracking and placement processes – leading to a high number of CPI cancellations.  (*Id.* ¶ 81).  According to the Government, the high CPI cancellation rate placed National General on notice that its records were replete with inaccuracies.  Thus, the Government alleges that National General knowingly and recklessly (1) made misrepresentations to borrowers and Wells Fargo and (2) improperly force-placed CPI on borrowers' loans.  Issues regarding knowledge and intent are predominantly factual issues that are not well-suited for resolution on a motion to dismiss.  For these reasons, and for the reasons explained more fully in the specific intent section of this opinion, the Court holds that the Government adequately pled that National General knowingly participated in a scheme to defraud borrowers and Wells Fargo.

**5.  Specific Intent to Defraud**

National General argues that the mail and wire fraud related counts must be dismissed because the Government did not plead that National General acted with the specific intent to

defraud, which National General argues, requires the misrepresentations to be made with the intent to deceive or cheat borrowers and Wells Fargo. (ECF No. 18-1, pp. 32-35). National General contends that allegations that it recklessly placed CPI policies do not satisfy the specific intent requirement in the context of fraud allegations. (*Id.* at 35-37). For the foregoing reasons, the Court holds that the Government adequately pled that National General acted with the requisite intent to defraud.

To establish fraudulent intent necessary for mail and wire fraud, the Government must establish that National General acted with the specific intent to defraud. *See e.g., Dobson*, 419 F.3d at 237. Specific intent "may be found from a material misstatement of fact made with reckless disregard for the truth." *Care One Mgmt. LLC v. United Healthcare Workers E.*, 43 F.4th 126, 137 (3d Cir. 2022); *see also United States v. Cen–Card Agency/C.C.A.C.*, 724 F. Supp. 313, 316–17 (D.N.J. 1989) (requiring the Government to prove that the defendants had a specific intent to defraud or that they "made material misrepresentations of fact with reckless disregard to their truth or falsity"); *United States v. Sheiner*, 273 F. Supp. 977, 982 (D.C.N.Y. 1967) (holding that statutory crimes of mail fraud and fraud by wire are broad in their scope and may ordinarily be shown by proof of intentional devising of scheme to defraud and use of mails and wire communications in furtherance of scheme).

Likewise, under 18 U.S.C. § 1344(2), the relevant bank fraud statute, a defendant is prohibited from "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice . . . to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2). The Supreme Court has clarified that § 1344(2) does not require "the Government to prove that the defendant's scheme created a risk of financial loss to the bank," or

that the defendant intended to defraud a bank. *Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014).

National General raises several arguments as to why the complaint fails to plead specific intent. First, it argues that the Government fails to plead that National General acted with the intent to deceive borrowers because it took affirmative steps to avoid placing CPI on borrowers, refunded Wells Fargo when CPI was improperly placed, and placed CPI on only a small portion of the loans it was tracking. (ECF No. 18-1, pp. 32-33). The Court holds that these arguments are irrelevant at this stage in the litigation. The success of the scheme is not dispositive in mail and wire fraud litigation. *Frey*, 42 F.3d at 800. Moreover, these arguments are not well-suited for resolution on the pleadings. *See Watts v. Univ. of Del.*, 622 F.2d 47, 52 (3d Cir. 1980) (quoting *In re Yarn Processing Patent Validity Litig.*, 498 F.2d 271, 288 (5th Cir. 1974) ("[I]ssues involving state of mind and intent are not well suited to disposition by summary judgment, since much depends upon the credibility of the witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder.")).

Second, as discussed above, National General argues that its statements to borrowers were accurate regarding its records. (ECF No. 18-1, p. 36). According to National General, whether it recklessly placed CPI is "wholly divorced from any notion of recklessness with respect to the *accuracy* of [its] statements." (*Id.* (emphasis in original)). In sum, it argues that recklessness with regards to an action is insufficient under the mail and wire fraud statutes to plead fraudulent intent. According to National General, the required intent must be established by a recklessly false statement. Since it argues that its statements were not *patently* untrue, National General contends that the Government did not plead specific intent to defraud. The Court holds that National General misinterprets the case law surrounding intent to defraud. Allegations that a defendant

made a misrepresentation with reckless disregard for the underlying truth of the representation are sufficient to allege the requisite specific intent. *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 769 (8th Cir. 1992) (holding that the court correctly found the defendant acted with specific intent to defraud when the defendant made a representation with reckless disregard for the truth). There is no requirement that National General act with reckless disregard to the truth of a patently false statement. Recklessness with regard to a misleading statement or misrepresentation is adequate. It is sufficient that National General allegedly had reason to know that its records were riddled with inaccuracies yet relied on them while notifying borrowers and Wells Fargo that certain loans needed CPI.

Third, National General argues that *United States v. Boyer*, 694 F.2d 58 (3d Cir. 1982) "stands on shaky ground." (ECF No. 18-1, p. 36). In *Boyer*, the Third Circuit held that holding that "the specific intent to deceive may be found from a material misstatement of fact made with reckless disregard of the facts." *Boyer*, 694 F.2d at 59. National General argues that recklessness is not a sufficient level of intent in the context of fraud allegations. (*Id.* at 37). National General acknowledges that the Supreme Court has not addressed the question presented in *Boyer*. Nevertheless, it argues that the Court should ignore binding Third Circuit precedent because (1) it is undermined by other Supreme Court cases regarding entirely different statutes and (2) the Supreme Court has trended toward interpreting federal fraud statutes narrowly. (*Id.*). The Court's role is not to predict how the Supreme Court would view binding Third Circuit precedent. The Court will apply the law as interpreted by the Third Circuit in *Boyer*, and other relevant cases, to the issue presented.

Finally, National General argues that the Government did not plead it had the requisite intent to defraud Wells Fargo because Wells Fargo had "visibility into [National General's] data."

(*Id.* at 34). National General contends that it could not have intended to deceive Wells Fargo while permitting Wells Fargo access to the underlying loan data and contact history for each borrower who National General identified to Wells Fargo as eligible for a CPI placement. (*Id.*). This argument fails. Under *Loughrin*, it is irrelevant whether National General intended to defraud Wells Fargo. *See Loughrin*, 573 U.S. at 356; *see also United States v. Warshak*, 631 F.3d 266, 275 (6th Cir. 2010) ("[T]he [G]overnment may prove specific intent to defraud a bank by showing specific intent to defraud a third party."). Moreover, the false statement need not be made directly to Wells Fargo. *Loughrin,* 573 U.S. at 356; *United States v. Dubose*, 2023 WL 7544992, at *3 (E.D. Pa. Nov. 13, 2023). The issue is whether National General executed a scheme to defraud to obtain Wells Fargo's property. As pled, National General allegedly engaged in a scheme to defraud borrowers by force-placing CPI that certain borrowers did not need. In turn, National General billed Wells Fargo for the CPI – representing that borrowers needed CPI when some did not. National General allegedly misled Wells Fargo. As a result, National General obtained bank property in the form of monetary payment for the CPI. At this stage of litigation, viewing the allegations in the light most favorable to the Government, National General may have possessed the intent to defraud borrowers (and thus obtain bank property) while sharing the underlying loan data with Wells Fargo. Moreover, if National General was reckless about the accuracy of this data, the data may have misled Wells Fargo into billing borrowers for CPI that they did not require.

The Government alleges that "National General knew or at least recklessly disregarded that it was falsely placing CPI and charging for duplicative insurance, but it took no meaningful steps to reduce the rate of false placements." (ECF No. 1, ¶ 8). The Government pled that National General knew or should have known "from the sheer volume of policies it canceled and premiums it had to refund that it was falsely placing CPI." (*Id.* ¶ 123). National General allegedly canceled

over 2.1 million CPI policies during the relevant period. Especially relevant is the alleged 1.25 million "flat cancellations." (*Id.* ¶ 79). A flat cancellation occurred when National General canceled a CPI policy because the borrower had outside insurance during the entire force-placed CPI coverage period. (*Id.* ¶ 65). On the other hand, a partial cancelation occurred when National General canceled a portion of its CPI policy because the borrower had outside coverage for some, but not all, of its CPI policy period. (*Id.*). The Government alleges that "[s]ystemic issues with National General's tracking and placement processes, of which National General was aware, caused these false placements." (*Id.* ¶ 81). "Rather than make any attempts to improve its operations, National General opted to continue falsely placing, and charging for, CPI for at least a decade." (*Id.*). The Government alleges that National General made false misrepresentations with an intent to defraud Wells Fargo when it sent Wells Fargo a list of borrowers who National General stated needed CPI, when in actuality, the borrowers had outside insurance coverage. (*Id.* ¶ 131-33).

The Court holds that the Government adequately pled specific intent to defraud based on a material misrepresentation made with reckless disregard for the truth. National General allegedly informed borrowers via letters and phone communications that they needed CPI to comply with the terms of their vehicle loans through Wells Fargo. National General then force-placed CPI and sent Wells Fargo documentation indicating that CPI was needed on certain loans. National General allegedly should have known that at least some of these borrowers did not need CPI because they already had outside insurance. While National General's records may have reflected that these borrowers needed insurance, the Government alleges that National General was reckless with regard to whether CPI was required when the high CPI cancellation rate should have alerted it to wide-spread errors in its records. The Government adequately pled that National General acted

with reckless disregard as to whether its records were accurate and whether borrowers truly needed

CPI as required by the mail, wire, and bank fraud statutes.

### 6. Use of the Mails in Furtherance of a Scheme to Defraud

National General argues that Counts I and II of the complaint, predicated on mail fraud,

must be dismissed because "there is no argument that the mailings were used in furtherance of the

scheme such that the scheme depended in some way on the charged mailings." (ECF No. 18-1, p.

28 n.81 (quotation marks and internal citations omitted)). The Government counters that it

properly pled that the mailings sent during the Letter Cycle and mailings that National General

caused Wells Fargo to send to borrowers were incident to an essential element of the scheme.

(ECF No. 26, pp. 33-34). The Court holds that the Government plausibly pled use of the mails in

furtherance of a scheme to defraud.

> The Supreme Court addressed this issue in *Schmuck v. United States*:
>
> "The federal mail fraud statute does not purport to reach all frauds, but only those
> limited instances in which the use of the mails is a part of the execution of the fraud,
> leaving all other cases to be dealt with by appropriate state law." *Kann v. United
> States*, 323 U.S. 88, 95 (1944). To be part of the execution of the fraud, however,
> the use of the mails need not be an essential element of the scheme. *Pereira v.
> United States*, 347 U.S. 1, 8 (1954). It is sufficient for the mailing to be "incident
> to an essential part of the scheme," or "a step in [the] plot," *Badders v. United
> States*, 240 U.S. 391, 394 (1916).

*Schmuck v. United States*, 489 U.S. 705, 710-11 (1989);[4] *see also Frey*, 42 F.3d at 798 ("[T]he

mere classification of a letter as a routine business mailing is [not] a defense to mail fraud."

(internal quotations and citations omitted)). It is irrelevant whether the mailing later, through

hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the

fraud. *Id.* at 799. Further, the mail fraud statute does not require the defendant to actually use the

---

[4] The Court notes that the mailing requirement may be satisfied by "innocent mailings" – ones that
contain no false information. *Id.*

mails.  It is sufficient if the defendant "*caused* a mailing to be used in furtherance of the scheme." *United States v. Fallon*, 61 F.4th 95, 114 (3d Cir. 2023) (emphasis added).  An entity causes a mailing where it "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended . . . ." *Pereira*, 347 U.S. at 9.

The Government pled that National General sent borrowers mailings during the Letter Cycle.  (*See e.g.,* ECF No. 1, ¶¶ 45, 64, 83, 93).  Further, it alleged that National General caused the use of the mails when it had knowledge that Wells Fargo would send bills to borrowers reflecting the increased premium after National General force-placed the CPI policy.  (*Id.* ¶¶ 156, 206, 217).  The bills Wells Fargo sent to borrowers were essential to the alleged scheme as the bills prompted borrowers to pay for the CPI.  Even if the Letter Cycle mailings were not essential to the scheme, they were, at least, "a step in the plot" and incident to an essential part of the scheme – fraudulently force-placing CPI.  The Court holds that the Government properly pled use of the mails in furtherance of a scheme to defraud as required by the mail fraud statute.  *Cannon v. Wells Fargo Bank. N.A.*, 2014 WL 324556, at *3 (N.D. Cal. Jan. 29, 2014) (holding that the defendants used the mails in furtherance of a scheme to defraud when the defendants mailed the plaintiffs notice and letters regarding force-placed insurance).

### 7.  Pleading Requirements of Rules 8 and 9(b)

#### a.  *Group Pleading (Rule 8)*

National General argues that the Government's complaint violated Federal Rule of Civil Procedure 8(a)(2) ("Rule 8(a)(2)").  (ECF No. 18-1, p. 38).  It contends that the Government engaged in impermissible group pleading by making no attempt to distinguish among the four defendants (NGHC, NGIC, NGLS, and Newport) or specify which defendants took which actions.

(*Id.*).  Instead, the complaint refers to National General as encompassing all Defendants and thus pleads that each legal entity was responsible for every action alleged.  (*Id.*).  National General argues that this alleged pleading flaw requires dismissal of the complaint.  (*Id.*).  The Government counters that group pleading is permissible "when related defendant entities have organized themselves in a manner that makes the entities difficult to distinguish."  (ECF No. 26, p. 37).

Rule 8(a)(2) requires a pleading to contain "a short and plain statement of the claims showing that the pleader is entitled to relief."  FED. R. CIV. P. 8.  The primary purpose of Rule 8 is to ensure the pleading "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555.  A pleading must enable a defendant to respond intelligibly.  Group pleading generally is violative of Rule 8(a)(2) because it deprives each defendant from discerning what it, specifically, did wrong.  *Clayton's Auto Glass, Inc. v. First Data Corp.*, 2013 WL 5460872, *5 (E.D.N.Y. 2013) ("[T]he Complaint refers to both defendants and their unnamed related entities collectively as 'First Data'. . . .  Such 'group pleading' fails to give each defendant fair notice of the claims against it . . . and, thus, fails to satisfy . . . the notice pleading requirements of Rule 8.").  Nevertheless, group pleading is permissible, in certain circumstances, when the allegations are sufficient to put the defendant on notice of its alleged wrongdoing.  *See e.g., In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1056 (E.D. Mich. 2018) (holding that the plaintiffs' pleading was permissible when the plaintiffs referred to two separate but interrelated corporate entities under one umbrella term); *U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1035 (S.D. Fla. 2007) (denying a motion to dismiss based on group pleading where the plaintiffs use an umbrella term to refer to multiple entities when the entities had a "day-to-day interrelationship"); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 173 (2d Cir. 2015) (holding that group pleading was, at most, "excusable

mislabeling" not warranting dismissal when plaintiffs used an umbrella term to refer to entities that were members of a corporate subgroup).[5]

NGHC is a direct wholly owned subsidiary of Allstate Insurance Holdings, LLC and an indirect wholly owned subsidiary of the Allstate Corporation (collectively "Allstate"). (ECF No. 1, ¶ 13). NGLS is a wholly owned subsidiary of NGHC. (*Id.* ¶ 15). NGIC is a subsidiary of NGHC. (*Id.* ¶ 16). Newport is a wholly owned subsidiary of NGLS. (*Id.* ¶ 17). Given the affiliations and interrelations between Defendants, the Government's complaint was sufficient to put every Defendant on notice of the alleged conduct to allow them to respond intelligibly. Thus, it complies with Rule 8. Although the precise identity of the subsidiary which may have taken certain actions is unclear, that level of detail is unnecessary to allow National General to understand the claims against it.

Further, National General argues that the complaint is "littered with conclusory, vague, and immaterial facts that further merit dismissal under Rule 8(a)(2)." (ECF No. 18-1, p. 41 n.142) (internal citations omitted). The Government contends that the factual allegations are relevant to the Government's claims and, even if the Court finds some facts to be irrelevant, there is no precedent for outright dismissal of the complaint under such circumstances. (ECF No. 26, p. 38).

The United States Court of Appeals for the Eleventh Circuit has developed most of the case law regarding impermissible "shotgun pleadings." *See e.g., Weiland v. Palm Beach Cnty. Sheriff's*

---

[5] National General contends that a complaint may only engage in group pleading where defendants were alter-egos of each other or in a principal-agent relationship. This is not an accurate representation of the law addressing group pleadings. National General cites *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194 (D.N.J. 2020) to support its argument. This case does not *require* corporations to be alter-egos or agents of each other for group pleading to be permissible. *Ponzio*, 447 F. Supp. 3d at 226. It simply permits group pleading in a situation where the defendants were part of the same corporate structure. It does not limit other circumstances where group pleading is permissible.

*Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). One type of shotgun pleading is a complaint "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 1322. Under Eleventh Circuit jurisprudence, shotgun pleadings are "flatly forbidden" by Rule 8 because "they are calculated to confuse the enemy and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked." *Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021) (internal quotations and citations omitted).

National General argues that the following allegations demonstrate the sort of immaterial facts that render the Government's complaint a "shotgun pleading":

> (1) The Complaint contains numerous allegations concerning partial cancellations, when none of the alleged FIRREA violations relate to partial cancellations.
> (2) The Complaint alleges non-monetary harms to borrowers . . . such as an impact to borrower credit scores, but wire, mail, and bank fraud only prohibit defrauding people out of money or property.
> (3) The Complaint discusses the use of CPI by certain other financial institutions, statements wholly irrelevant to whether [National General] allegedly defrauded Wells Fargo or its borrowers.

(ECF No. 18-1, p. 41 n.142). The Court holds that these are not the kind of facts meant to confuse opposing counsel. These facts are connected to the Government's causes of actions and theory of the case. Even if these facts are not strictly necessary to prove the Government's allegations, they are not so immaterial so as to violate Rule 8.

### b. Particularity (Rule 9(b))

National General argues that the Government's complaint should be dismissed under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") because it failed to plead (1) how National General's statements were false and misleading or how they contributed to the alleged fraudulent scheme; (2) how National General's statements influenced the decision of borrowers; and (3) what false statements National General made to the borrowers or Wells Fargo. (ECF No. 18-1, pp. 39-

40).  National General further contends that the complaint is deficient because it omits details necessary to the complaint's allegations including who the borrowers are, the details of their loans, the details and duration of their insurance, and what actions they took in response to outreach from National General.  (*Id.* at 41).  The Government counters that its complaint sets out the scheme and the scheme timeline, describes the steps taken by National General to accomplish the scheme to defraud, and discusses the effects on and responses from borrowers and Wells Fargo.  (ECF No. 26, p. 39).  Further, the Government argues that in cases of long-spanning fraudulent conduct, it is required to describe only the scheme itself with particularity – not the details of every fraudulent transaction.  (*Id.*)  For the reasons below, the Court holds that the Government satisfied the requirements of Rule 9(b).

Rule 9(b) requires plaintiffs to plead the circumstances of the alleged fraud with particularity to ensure that defendants are placed on notice of the "precise misconduct with which they are charged, and to safeguard defendants against spurious charges" of fraud.  *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989).  It requires the identification of the elements of the fraud claim.  *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 99 (3d Cir. 1983) (internal citations omitted).  Nonetheless, focusing exclusively on the particularity requirement is "too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules."  *Id.* at 100 (internal citations omitted).  Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud."  *Id.* at 99–100.  Particularly in cases of corporate fraud, the Government cannot be expected to have pre-discovery knowledge of the details of corporate internal affairs.  *Id.*

The Court holds that the Government's allegations satisfy Rule 9(b). The Government identifies the exact communications containing the alleged misrepresentations, including but not limited to: Coverage Issued Letters, telephone calls to borrowers, bills reflecting the increased premiums because of the placement of CPI, and information sent to Wells Fargo detailing the loans which required forced CPI placement. (ECF No. 1, ¶¶ 50, 53, 57). Additionally, the Government provides twelve examples of borrowers who were affected, in some manner, by National General's alleged scheme to defraud. (*See id.* ¶¶ 61, 90-91, 113, 138-39, 142, 149-51, 180-91). These examples, drawn throughout the alleged relevant period, appear sufficient "in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme, . . . such that a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims." *See Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 511 (6th Cir. 2007). Thus, the Government sufficiently identifies the circumstances of the allegedly false or fraudulent communications, their contents and timing, and explains why each form of communication was false or misleading. The Government's pleading is sufficient as it pled "particular details of a scheme . . . paired with reliable indicia that lead to a strong inference" that National General engaged in a scheme to defraud. *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 157-58 (3d Cir. 2014) (internal citations omitted). It did more than "merely describing an opportunity for fraud" by pleading specific circumstances under which the scheme was allegedly undertaken and carried out. *See id.*

It is irrelevant that the Government did not plead specific details, such as the identity of the borrowers, details of their loans, *etc.*, because "[w]hether a complaint complies with [] Rule [9(b)] . . . depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail

is necessary to give notice to the adverse party and enable him to prepare a responsive pleading."
*See United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013). "In particular, where the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct." *Id.*; *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (rejecting the argument that "the district [court] had to address each of the 1,812 claim forms"). The alleged relevant period ranges from April 24, 2008, through September 30, 2016. (ECF No. 1, ¶ 1). Given the long-spanning and wide-ranging nature of the alleged fraud, the Government's pleading is sufficient to meet the requirements of Rule 9(b).

## 8. Reverse Preemption and the McCarran-Ferguson Act

National General argues that the Government's claims are reverse preempted by the McCarren-Ferguson Act. (ECF No. 18-1, p. 42). It contends that allowing the complaint to move forward would implicitly dictate how a CPI reminder cycle should operate, thus impairing California's right to regulate the insurance business. (*Id.* at 45).[6] National General points to two provisions of the California Insurance Code, Sections 38 and 381.1. (*Id.* at 44). Section 38 states that "any notice required to be given to any person by any provision of this code may be given by mailing notice, postage prepaid, addressed to the person to be notified, at his residence or principal place of business in this State." (*Id.*). National General argues that the Government's complaint attacks the process by which National General contacted borrowers at their last known address – thus, undermining this regulation. (*Id.*). Section 381.1 of the California Insurance Code details what information must be "provided to the policyholder at the time of application for, or issuance

---

[6] National General contends that California is the relevant state law in this inquiry. (ECF No. 18-1, p. 44). The Government does not dispute that proposition. (See ECF No. 26, pp. 39-42). Thus, the Court assumes, for the purpose of this analysis, that California is the state at issue.

of, a policy of automobile insurance." (*Id.*). National General contends that "the [c]omplaint alleges that [National General] acted fraudulently in sending the Coverage Issued Letters to borrowers after Wells Fargo directed [National General] to place CPI," thus impending § 381.1. (*Id.*). Finally, National General highlights that California has prohibited "unfair method[s] of competition or . . . unfair or deceptive act[s] or practice[s] in the business of insurance," and the civil penalties under FIRREA (which exceed $1 million per violation) dwarf those available under California's unfair competition claims (which are capped at $10,000 per act). (*Id.* at 45).

The Court holds that the Government's FIRREA claims are not reverse preempted by the McCarran-Ferguson Act. The McCarran-Ferguson Act reverse preempts federal laws affecting state regulation of insurance. Under McCarran-Ferguson, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). Under § 1012, state laws reverse preempt federal laws if (1) the state statute was enacted "for the purpose of regulating the business of insurance," (2) the federal statute does not "specifically relate to the business of insurance," and (3) the federal statute would "invalidate, impair, or supersede" the state statute. *Suter v. Munich Reinsurance Co.*, 223 F.3d 150, 160 (3d Cir. 2000).

The California Insurance Code was enacted for the purpose of regulating insurance. Neither FIRREA nor the underlying mail, wire, and bank fraud statutes specifically relate to the business of insurance. The first two factors weigh in favor of reverse preemption. Thus, the issue is whether FIRREA invalidates, impairs, or supersedes the California Insurance Code. The Supreme Court has given the following guidance regarding the third factor: (1) a federal law "invalidates" a state insurance law if it "render[s] [it] ineffective without providing a replacement

rule or law"; (2) a federal law "supersedes" a state insurance law if it displaces it by providing a substitute rule; and (3) a federal law "impairs" state insurance regulation when it frustrates or interferes with a state's administrative regime. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999). A court in the Central District of California has considered a very similar case in *In re Wells Fargo Ins. Mktg. & Sales Pracs. Litig.*, 2018 WL 9536803 (C.D. Cal. Dec. 14, 2018). In that case, the plaintiffs, on behalf of national and state classes, brought various claims, including Racketeer Influenced and Corrupt Organization Act ("RICO") claims, against National General and Wells Fargo in relation to the force-placing of CPI. *In re Wells Fargo*, 2018 WL 9536803, at * 1. There, the court declined to find reverse preemption and stated: "RICO complements or supplements the state's legislative scheme, and the imposition of liability under RICO would not necessarily subject [Wells Fargo] to conflicting standards of conduct in its marketing and sale of auto insurance." *Id.* at *6.

Like in *In re Wells Fargo*, FIRREA does not invalidate any provision of the California Insurance Code. It does not render any of the California Insurance Code ineffective – nor does it supersede any portions of the code. Further, applications of FIRREA do not impair California's Insurance Code because FIRREA and California's insurance laws do not directly conflict. In fact, the alleged conduct may also be unlawful under the California Insurance Code which prohibits "[m]aking or disseminating . . . any statement . . . which is untrue, deceptive, or misleading." Cal. Ins. Code. §§ 790.02, 790.03(b). The Government alleges that National General engaged in deceptive practices by fraudulently informing borrowers and Wells Fargo that CPI was necessary when it was not. The Government's FIRREA claims do not conflict or impair any state enactment or substantive policy, but instead advance California's interest in combating fraud and deception. *See e.g., Humana*, 525 U.S. 299 at 313 ("RICO's private right of action and treble damages

provision appears to complement Nevada's statutory and common-law claims for relief."); *United States v. Stewart*, 955 F. Supp. 385, 391 (E.D. Pa. 1997) (stating in the context of a RICO prosecution: "The federal interest here is to protect the public from acts of racketeering and from use of the mails and wires for fraudulent purposes. That effort is 'perfectly compatible' with the Commonwealth's interest in protecting policyholders and with its insurance regulatory responsibilities generally."); *United States v. Cavin*, 39 F.3d 1299, 1305 (5th Cir. 1994) (stating in the context of a conspiracy to defraud prosecution that the Government's "interest in the fraud prosecution is completely compatible with the state's regulatory interests."). The California Insurance Code is not invalidated, impaired, or superseded by the application of FIRREA to the alleged conduct. The Court holds that FIRREA claims are not reverse preempted under the McCarran-Ferguson Act.[7]

## IV.  CONCLUSION

For these reasons, National General's Motion to Dismiss (ECF No. 18) will be denied. An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

4/14/25

Dated

---

[7] National General raised a multitude of arguments as to why the complaint should be dismissed in its motion to dismiss (ECF No. 18), supporting brief (ECF No. 18-1), and reply memorandum of law in support of its motion to dismiss, (ECF No. 32). The Court addressed the most relevant and focused arguments in this opinion. To the extent the Court did not address an argument raised in one of these documents, the Court did not find the argument to be dispositive in adjudicating the motion to dismiss.